BYE, Circuit Judge.
Relators Norman Rille and Neal Roberts brought a qui tam action against Hewlett-Packard Company (HP) alleging HP engaged in unlawful kickback and defective pricing schemes in its sale of computer equipment to the federal government. The United States intervened in the action and reached a $55 million settlement with HP, allocating $9 million of the settlement to the kickback scheme and $46 million to the defective pricing scheme. The district court[1] awarded the relators a 21% share of the kickback settlement and a 15% share of the defective pricing settlement pursuant to 31 U.S.C. § 3730(d)(1). The United States appeals, contending the relators are not entitled to any share of *1013 the $46 million allocated to the defective pricing scheme. We affirm.
I
Systems integration consultants (SICs) recommend computer systems and related technology products to the federal government. SICs sometimes buy computer products directly from manufacturers and then resell them to the government; other times SICs recommended a particular manufacturer to the government and the manufacturer sells its products directly to the government.
Accenture LLP and Accenture Ltd. (collectively Accenture) were SICs. Norman Rille worked as a senior manager for Accenture from 2000 to 2002. While working at Accenture, Rille discovered the company was involved in what it called an “Alliance” relationship with HP and other computer and technology vendors who sold computer equipment to the government. Under these “Alliance” relationships, SICs received kickbacks from HP and other companies in two forms: (1) lump sum payments made by HP to SICs for recommending HP products to the government; and (2) discounts given to SICs when they purchased HP products for resale to the government.
Rille left Accenture with over 700,000 pages of electronic data related to the “Alliance” relationships. He shared this information with Neal Roberts, a certified fraud examiner. Roberts investigated the relationships by studying the data provided by Rille. On September 8, 2004, Roberts and Rille disclosed the documents involving the Alliance relationships to the government.
Shortly thereafter on September 17, 2004, Rille and Roberts filed a qui tam action against HP and other defendants on behalf of the United States. The original complaint alleged HP violated the Anti-Kickback Act, 41 U.S.C. §§ 51-52, as well as the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733. The relators alleged the computer companies defrauded the government out of “hundreds of millions of dollars” by exchanging unlawful kickbacks to consultants for government referrals and by engaging in defective pricing schemes.
As relevant to the issues now on appeal, the relators amended their complaint to set forth the fraud allegations in more detail. The amended allegations regarding the defective pricing scheme stated HP “exploited the trust the Government ha[d] reposed in them ... to provide accurate best pricing information.”[2] Second Am. Compl. at ¶ 5, App. at 47. More specifically, the Second Amended Complaint alleged:
[A]s part of the schemes to defraud the Government and concealment, Defendants failed to provide to GSA and other governmental agencies current, accurate, and complete disclosure of their best pricing (after all discounts, rebates, and other benefits) for any entities, whether such entity sells to the Government or not, ... thereby causing defective GSA and other governmental pricing schedules. This resulted in FCA violations, as to both direct sales to the Government by a Defendant, and indirect sales through [a consultant], Alliance, or Technology Vendor, with or without a Kickback.
Id. at ¶ 6, App. at 48.
During the course of the relators’ suit, the relators worked closely with govern *1014 ment investigators and attorneys to corroborate HP’s unlawful practices. Among other things, the relators hosted meetings with government officials in September 2005 and August 2006 to coordinate prosecution of the fraud action. In October 2005, the government asked the relators’ counsel to draft administrative subpoenas to issue from the General Services Administration (GSA) Office of Inspector General (OIG) to all potential defendants, including HP, and compiled voluminous binders for the government’s use, detailing thirty-one separate subpoenas. Also at the government’s request, in November 2006 the re-lators prepared a “lexicon” of forms used by HP in Alliance programs. The relators also purchased a document review software system called “Ringtail” to electronically house the voluminous documents produced as a result of the subpoenas, along with thirty-eight individual licenses for federal agents to use the Ringtail system to review the documents. Federal agents made use of the licenses. For example, over a three-year period beginning in September 2006, one OIG agent accessed roughly 4,230 documents using the Ring-tail system.
After responding to the subpoenas, HP notified the government it had hired an independent third party to assess its business processes to determine whether it had engaged in defective pricing schemes. In August 2008, HP notified the government of the results of the independent audit, admitting it had not complied with the price reductions clause in one particular government contract, GS-35F-0066N (hereinafter Contract 35F). The government then performed its own audit of Contract 35F and determined HP had not fully informed the GSA of prices it had given to non-government end users, resulting in a “defectively priced” GSA contract. Ultimately, HP changed its practices by lowering its prices by 10%, saving the government millions of dollars.
The government decided to intervene directly in the relators’ action in December 2006 and filed its own complaint against HP and the other defendants in the rela-tors’ action in April 2007. In its separate complaint, the government acknowledged the relators’ complaint “made detailed allegations regarding the Relators’ direct and independent knowledge of [the] wrongdoing alleged herein.” Government Compl. at ¶ 9. In many respects, the government’s complaint simply paraphrased directly from the relators’ complaint.
On August 30, 2010, the government and HP entered into a settlement agreement of what they labeled the conduct “covered” by the relators’ action. Under the terms of the settlement, the government received $55 million from HP. The government attributed $9 million of the settlement to the kickback scheme alleged in the relators’ action, and attributed the remaining $46 million to the defective pricing scheme related to Contract 35F. In the settlement agreement, the government attributed the defective pricing settlement to HP’s “voluntary” disclosure of its false pricing and the government’s subsequent audit. The relators’ action was dismissed with prejudice as a result of the settlement.
After the district court approved settlement, the relators moved for a determination of their share of the settlement proceeds pursuant to 31 U.S.C. § 3730(d)(1).[3] *1015 The relators contended the government had no knowledge of HP’s misconduct pri- or to the relators’ complaint, and the rela-tors had devoted substantial effort and assistance to investigating HP’s fraud, including drafting the subpoenas that caused HP to hire an independent third party to conduct an audit of its pricing practices. The relators argued they were entitled to a percentage of both the kickback and defective pricing portions of the settlement award.
In response, the government conceded the relators were entitled to a share of the $9 million settlement involving the kickback scheme. The government argued, however, the relators were not entitled to any portion of the $46 million defective pricing settlement. The government claimed the relators’ allegations of defective pricing failed to satisfy the requirements for pleading fraud under Rule 9(b) of the Federal Rules of Civil Procedure. In addition, the government contended the discovery of defective Contract 35F resulted from HP’s voluntary disclosure and the government’s own investigation, and was wholly unrelated to the relators’ action.
The district court was unpersuaded by both of the government’s contentions. The district court held the government’s Rule 9(b) argument was untimely. The district court also found the defective pricing claim settled by the government was related to the action brought by the rela-tors. The district court found a relationship between HP’s internal investigation and the relators’ complaint and assistance in prosecuting the action, noting “HP began its internal investigation just a few weeks after the seal was partially lifted [on the relators’ complaint and] a copy of Rela-tors’ Complaint [was] provided to HP.” The district court also found “[t]he government had no knowledge of the defective pricing before Relators brought it to light.” As a result, the district court held the relators were entitled to the minimum 15% finder’s fee with respect to the $46 million attributed to the defective pricing settlement. The district court also determined the relators were entitled to 21% of the $9 million kickback settlement.
The government filed a timely appeal. On appeal, the government does not contest the 21% awarded to the relators on the $9 million kickback settlement, but renews its contentions that the relators are not entitled to any portion of the $46 million defective pricing settlement.
II
We review the district court’s factual findings for clear error and its legal conclusions de novo. Clay v. Bd. of Educ. of City of St. Louis, 90 F.3d 1357, 1361 (8th Cir.1996). Before reviewing the government’s challenges to the district court’s fact findings and legal conclusions, we begin with a brief summary of the overall structure of the FCA with respect to a relator’s right to share in a recovery.
The government has three options when a relator initiates a qui tarn, action on behalf of the government under the FCA. The government’s ultimate election among the options has a direct effect on the relator’s right to share in a recovery. First, the government may elect not to intervene in the relator’s action. In such situations, the relator is left to pursue the action on her own on behalf of the government, while the government sits on the sidelines and is merely served with copies of all pleadings and deposition transcripts filed in the action. 31 U.S.C. § 3730(c)(3). If a relator successfully prosecutes the action on her own, she is entitled to a greater *1016 percentage of any amount ultimately recovered — 25% to 30% of the “proceeds of the action or settlement” as well as “reasonable expenses ... plus reasonable attorneys’ fees and costs.” Id. § 3730(d)(2). Because the government elected to intervene in this action, this provision is not in play.
Second, the government may elect to intervene in the relator’s action. The FCA provides that a relator is entitled to a share of a settlement from a qui tam action when “the Government proceeds with an action brought by a [relator].” 31 U.S.C. § 3730(d)(1). In cases where the government elects to intervene, the relator is entitled to a lesser share of any amount ultimately recovered' — 15% to 25% of the “proceeds of the action or settlement of the claim” depending upon the extent to which the person substantially contributed to the prosecution of the action. Id. § 3730(d)(1). This is what occurred here. The action was originally brought by the relators, and the government subsequently intervened.
In cases such as this where the government intervenes, the minimum share of 15% is viewed as a finder’s fee to which a relator is entitled even when he or she does not substantially contribute to the prosecution of the action. See S. Rep. 99-345, 1986 U.S.C.C.A.N. 5266, 5293 (describing the 15% minimum as a “definite amount” which could “be looked upon as a ‘finder’s fee’ which the person bringing the case should receive as of right”).
If the Government comes into the case, the person is guaranteed a minimum of 15% of the total recovery even if that person does nothing more than file the action in federal court. This is in the nature of a “finder’s fee” and is provided to develop incentives for people to bring the information forward. The person need do no more than this to secure an entitlement to a minimum 15%.
132 Cong. Rec. H9382-03.
There are three statutory exceptions to the 15% minimum finder’s fee in situations where the government elects to proceed with a relator’s action and obtains a judgment or settlement. The statutory exceptions to the minimum finder’s fee are as follows: (1) an additional reduction if the relator himself “planned and initiated” the FCA violation, see 31 U.S.C. § 3730(d)(3); (2) no share in a recovery if the relator “is convicted of criminal conduct arising from his or her role in the violation,” id.; or (3) a limitation of the relator’s share to “no ... more than 10 percent of the proceeds” when the relator’s claim is “based primarily on disclosures of specific information” traceable to a source other than the relator, id. § 3730(d)(1). Thus, in cases where the government elects to intervene in an action, a relator is entitled to a share of the recovery between 15% and 25% unless one of the three statutory exceptions permitting an additional reduction applies.
Finally, the government “may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty.” Id. § 3730(c)(5). When the government elects to pursue an alternate remedy, the relator who initiated the original action “shall have the same rights in such proceeding as such person would have had if the action had continued under this section.” Id. The government did not elect to pursue an alternate remedy in this case, and thus this provision is not in play.
In this case, the government’s election to proceed with the action originally brought by Rille and Roberts triggered the 15% to 25% provisions of the FCA. In addition, the district court found that Rille and Roberts substantially contributed to *1017 the prosecution of the action. Finally, none of the three statutory exceptions permitting an additional reduction were applicable because (1) neither relator planned or initiated the FCA violation, (2) neither relator was prosecuted criminally for a role in the FCA violation, and (3) the relators’ action was not based primarily upon disclosures of information attributable to a source other than the relators. Indeed, the district court specifically found “the Government had no knowledge of the defective pricing before Relators brought it to light,” and the government does not challenge that fact finding on appeal. As a result, the district court correctly awarded the relators a share of the defective pricing settlement.
The government argues the relators are not entitled to a share of the defective pricing settlement, despite the government’s election to proceed with the rela-tors’ action, on the grounds that the defective pricing claim it settled was not the same defective pricing claim alleged in the relators’ complaint. The government argues if it pursues a factually unrelated claim not contained in a relator’s complaint, the FCA does not entitle the relator to any share in the corresponding recovery. This argument fails on both the facts and the law with respect to the circumstances present in this case.
With respect to the facts involved in this case, the district court found the defective pricing claim settled by the government was related to the action brought by the relators. The government has failed to identify on appeal any clear error in that factual finding, and we find none. As the district court noted, HP began the internal audit of its pricing practices only after becoming aware of the allegations in the relators’ complaint, and only after responding to the extensive subpoenas drafted by the relators at the government’s request. Thus, the government’s claim that HP’s disclosure of its defective pricing on Contract 35F was purely “voluntary,” and that the relators’ pending action and assistance in prosecuting the action played no role in uncovering the defective pricing scheme, is disingenuous.
With respect to the law applicable to this case, the government argues the defective pricing scheme alleged in the rela-tors’ complaint should not be considered the same defective pricing claim the government settled with HP involving Contract 35F unless the relators’ complaint satisfied the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. The government argues a qui tam claim which is deficient as measured by Rule 9(b) standards “necessarily lacks the type of specific information about fraud that would provide the government any meaningful assistance.” The government therefore urges our court to incorporate the requirements for surviving a motion to dismiss under Rule 9(b) into the test for determining whether “the Government proceeds with an action brought by [a relator]” for purposes of an award to a qui tam plaintiff under 31 U.S.C. § 3730(d). The government contends if a particular claim is not pleaded with enough sufficiency to survive a motion to dismiss, it should not be considered part of the action in which the government elects to intervene.
We reject the contention that Rule 9(b) plays a part in determining whether a relator is entitled to share in the settlement proceeds resulting from a qui tam action in which the government elects to intervene. Rule 9(b)’s standards are meant to test the sufficiency of a complaint at its outset. If a defendant challenges the sufficiency of a complaint’s allegations at the outset of a case, a plaintiff still has the opportunity to cure the deficiency. In contrast, section 3730(d) only comes into *1018 play at the conclusion of a case, after the action has already proceeded to a judgment or a settlement. If the government is allowed to contend at the conclusion of a case that a relator’s initial allegations were insufficient, even though the government implicitly acknowledged the legal sufficiency of the pleadings by choosing to intervene, the relator no longer has the opportunity to cure the deficiency. We find nothing in the FCA’s statutory text to support this type of post hoc use of Rule 9(b) to deny a relator the right to a share of the settlement proceeds in an action in which the government intervenes.
Our conclusion is consistent with an analogous situation addressed by the D.C. Circuit in United States ex rel. Batiste v. SLM Corp., 659 F.3d 1204, 1210 (D.C.Cir.2011). Batiste involved a qui tam action alleging SLM Corporation (commonly called Sallie Mae) was defrauding the government through its administration of certain student loans by granting forbear-ances in violation of federal forbearance regulations. 659 F.3d at 1206. Before Batiste filed his qui tam action, another putative relator, Michael Zahara, had already filed a qui tam action making similar allegations of fraud against Sallie Mae. Zahara’s action was still pending when Batiste filed his complaint, but Zahara’s complaint was ultimately dismissed without prejudice when he was unable to obtain counsel to represent him. Id. at 1207.
After Batiste filed his qui tam action containing fraud allegations similar to those involved in Zahara’s action, the government moved to dismiss Batiste’s complaint under the FCA’s first-to-file rule, which provides “[w]hen a person brings an action under [the qui tam] subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.” 31 U.S.C. § 3730(b)(5). Batiste opposed the government’s motion to dismiss, arguing Zahara’s earlier-filed suit was not a pending action under the first-to-file rule because his complaint did not meet Rule 9(b)’s heightened pleading standards for fraud allegations. The district court rejected Batiste’s argument, found that his complaint contained the same material elements of fraud as Zahara’s complaint, and granted the government’s motion to dismiss. Batiste, 659 F.3d at 1207-08.
On appeal, the D.C. Circuit affirmed the district court. In explaining its holding, the court included a discussion of the different purposes served by the FCA and Rule 9(b)’s heightened pleading requirements:
Rule 9(b) is designed to protect defendants in fraud cases from frivolous accusations and allow them to prepare an appropriate response. Section 3730(b) is designed to allow recovery when a qui tam relator puts the government on notice of potential fraud being worked against the government, but to bar copycat actions that provide no additional material information. As the district court found, a complaint may provide the government sufficient information to launch an investigation of a fraudulent scheme even if the complaint does not meet the particularity standards of Rule 9(b).
Id. at 1210.
This analysis applies with equal force when determining whether a relator is entitled to a share of the proceeds under section 3730(d). A primary purpose of the FCA is to encourage whistleblowers to come forward with allegations of fraud perpetrated upon the government, see id., and to reward them when they do so. This purpose is advanced when a relator files a complaint which “provides the government sufficient information to pursue an investigation” into the allegedly fraudulent practices. Id. The FCA’s purpose *1019 was advanced in this case. The relators’ complaint and assistance in prosecuting the action resulted in HP investigating its pricing practices. The government then chose to intervene in the relators’ action, initiated its own investigation into HP’s defective pricing, and ultimately reached a settlement favorable to the government. Thus, the relators’ action served its intended purpose, and the relators should be rewarded accordingly.
Two additional cases cited by the government merit our discussion. First, the government relies upon United States ex rel. Bledsoe v. Community Health Systems, Inc., 501 F.3d 493 (6th Cir.2007) (Bledsoe II). Sean Bledsoe brought a qui tam action in February 1998 alleging the Community Health Systems (CHS) in White County, Tennessee, were engaging in various fraudulent acts that increased reimbursements they received from the government through Medicare and Medicaid. 501 F.3d at 497-98. Significantly, prior to Bledsoe filing his action, the Office of the Inspector General of the Department of Health and Human Services had already approached CHS about possible irregularities in its Medicare billing practices in the fall of 1997. Id. at 499. As a result of the government’s inquiry, CHS agreed to perform an audit; the government also began an investigation through the Department of Justice to determine whether FCA violations occurred as a result of the irregular billing practices. Id. Although Bledsoe, a respiratory staff therapist at CHS, had met with a government agent after filing his qui tam action to share his suspicions about the irregular billing practices (first meeting in June 1998), he was unaware of the government’s separate and already ongoing investigation. Id.
As a result of the government’s own investigation, the government and CHS reached a settlement agreement in March 2000 which required CHS to pay the government $30,494,000 in exchange for a release from any civil or administrative monetary claim arising from the irregular billing practices between October 1994 and December 1997. This settlement specifically excluded any claims Bledsoe was bringing in his qui tam action. Id.
In July 2000, after the settlement, Bled-soe filed an amended complaint in his qui tam action, trying to connect his lawsuit to the settlement and claim a share of it. The district court denied Bledsoe’s request because the government had elected not to intervene in the qui tam action and instead pursued its own settlement negotiations. The district court also concluded Bledsoe’s complaint did not plead the fraud claims settled by the government with sufficient particularity. Id. at 499-500.
Bledsoe appealed and won. The Sixth Circuit said the relevant issue was not the fact that the government pursued settlement without intervening, because the settlement could constitute an alternate remedy under § 3730(c)(5), in which case Bledsoe could still be entitled to a share of the proceeds. United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 647 (6th Cir.2003) (Bledsoe I). The Sixth Circuit also said the district court abused its discretion by dismissing Bled-soe’s amended complaint for non-compliance with Rule 9(b)’s fraud specificity requirements, because the issue of whether a plaintiff must comply with Rule 9(b) to plead an FCA violation was unsettled at the time. Id. at 645. The court remanded the case to the district court, indicating it could not determine whether the allegations in the qui tam action sufficiently overlapped with the claims settled by the government, holding that on remand Bled-soe must provide “concrete evidence that he apprised the government of Defendants’ DRG coding violations” before he *1020 could share in the settlement proceeds. Id. at 651.
On remand, Bledsoe filed a second amended complaint and again made a claim for a share of the settlement proceeds. After an evidentiary hearing, the district court again denied the request, concluding Bledsoe failed to show his disclosures to the government led in any way to the settlement agreement entered into between the government and CHS. The district court also dismissed Bledsoe’s second amended complaint. Bledsoe filed a second appeal challenging the dismissal of his complaint and the district court’s denial of his request to share in the settlement proceeds.
In Bledsoe II (the case the government now relies upon) the Sixth Circuit held Bledsoe’s complaint had to comply with Rule 9(b)’s fraud particularity requirements to survive a motion to dismiss, and Bledsoe’s complaint did not satisfy Rule 9(b)’s requirements because it “lack[ed] specific dates or claims submitted to Medicare or Medicaid.” Bledsoe II, 501 F.3d at 515. The Sixth Circuit also concluded Bledsoe could not share in the settlement proceeds “because he has not alleged a valid qui tam action that overlaps in any way with the conduct covered by the Settlement Agreement.” Id. at 522.
Bledsoe II does not guide our analysis here. Unlike here, where the government elected to intervene in the relators’ action, Bledsoe II was a case where the government chose to pursue an alternate administrative remedy. The government had already started its own investigation prior to Bledsoe filing his initial qui tam action, and prior to Bledsoe meeting with government officials. After the fact, Bledsoe tried to amend his complaint twice to allege a sufficient connection between his action and the government’s existing settlement, and still failed to allege or prove such a connection, or to show he provided any information to the government that led to the settlement.
Here, there was no existing government investigation prior to the relators’ action, the government chose to intervene in the relators’ action, there is a temporal connection between the subpoenas issued by the relators and HP’s internal audit, and the settlement itself was reached in the relators’ action. In addition, in Bledsoe II the relator failed to show that any information he disclosed to the government led to the settlement. In sharp contrast, the information Rille and Roberts disclosed to the government was related to the settlement. Indeed, the district court specifically found “the Government had no knowledge of the defective pricing before Relators brought it to light,” and the government does not challenge that factual finding on appeal.
The second case the government relies upon is Rockwell International Corp. v. United States, 549 U.S. 457, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007). Rockwell addressed whether a relator, James Stone, qualified as an “original source” for jurisdictional purposes under the FCA. The statute considered by the Supreme Court required a relator to have “direct and independent knowledge of the information on which the allegations [in a qui tam action] are based” before a court could exercise jurisdiction over a qui tam action which itself was based upon publicly disclosed allegations.[4] 31 U.S.C. § 3730(e)(4)(A) (1994). The Supreme Court ultimately determined the relator did not qualify as an *1021 “original source” of the only claim which succeeded .at trial — a claim alleging pond-crete blocks stored at a nuclear weapons plant were leaking hazardous and nuclear waste due to a faulty mixture of cement and sludge. The Supreme Court held this successful claim was unrelated to a claim alleged by the relator predicting the plant would produce insolid pondcrete blocks because of a defective piping system. The Supreme Court focused on the fact that the relator was no longer employed at the plant when it changed the ratio of cement to sludge which caused the leaking to occur:
Stone’s prediction that the pondcrete would be insolid because of a flaw in the piping system does not qualify as “direct and independent knowledge” of the pondcrete defect. Of course a qui tarn relator’s misunderstanding of why a concealed defect occurred would normally be immaterial as long as he knew the defect actually existed. But here Stone did not know that the pondcrete failed; he predicted it. Even if a prediction can qualify as direct and independent knowledge in some cases (a point we need not address), it assuredly does not do so when its premise of cause and effect is wrong. Stone’s prediction was a failed prediction, disproved by Stone’s own allegations. As Stone acknowledged, Rockwell was able to produce “concrete hard” pondcrete using the machinery Stone said was defective. According to [the government’s] allegations in the final pretrial order, the insolidity problem was caused by a new foreman’s reduction of the cement-to-sludge ratio in the winter of 1986, long after Stone had left Rocky Flats.
Rockwell, 549 U.S. at 475-76, 127 S.Ct. 1897.
Rockwell does nothing to advance the government’s arguments here. The action brought by Rille and Roberts was not based upon publicly disclosed allegations within the meaning of the FCA, and the court’s jurisdiction over this action was never challenged on the grounds that the relators did not qualify as “original sources.” The government has never alleged the relators did not have direct and independent knowledge of the defective pricing, but instead focused on an after-the-fact alleged inadequacy in the pleadings alleging the claim. Here, as the district court specifically found, HP’s disclosure regarding Contract 35F resulted from HP’s knowledge of the relators’ defective pricing allegations, and from the relators’ assistance in prosecuting the action. The government has not shown this finding of fact to be clearly erroneous.
In sum, this case turns on fact findings the district court made regarding the relationship between the relators’ action (as well as the relators’ assistance in prosecuting the action) and HP’s subsequent disclosure of defective pricing in Contract 35F. The government has failed to reveal any clear error in the district court’s factual findings regarding that relationship. Moreover, at least with respect to those qui tam actions in which the government elects to intervene, a relators’ initial allegations need not satisfy Rule 9(b)’s heightened pleading requirements in order to accomplish the purpose they were meant to serve, which is to “provide the government sufficient information to launch an investigation of a fraudulent scheme[.]” Batiste, 659 F.3d at 1210.
Unlike the dissent, we do not believe the district court’s findings of fact were insufficient to justify awarding the relators a share of the recovery. When the district court held the government’s Rule 9(b) argument was untimely, it specifically rejected the government’s contention that the defective pricing claim covered in the settlement was not “part of this law suit.” R. Doc. 125, at 3. The district court also stat *1022 ed the fact that the defective pricing claim alleged in the Second Amended Complaint was “further developed after the Government intervened is not a reason to deprive Relators of their share of the settlement.” Id. at 4. Most significantly, the district court specifically found the “Government successfully proceeded with claims initially brought by Relators, and Relators are entitled to a share of the proceeds.” Id. at 5. These comments make it clear the district court found the defective pricing alleged by the relators was the same defective pricing claim the government settled.
Ill
For the reasons stated, we affirm the judgment of the district court.

. The Honorable Billy Roy Wilson, United States District Judge for the Eastern District of Arkansas.

. HP’s contracts with the federal government required HP to disclose its “best prices,” that is, the lowest prices HP offered to "end users” for its products. End users are buyers who purchase a product for their own use rather than for resale. The federal government used best pricing information to set its own contract prices with HP.

. The FCA provides in relevant part:
If the Government proceeds with an action brought by a [private] person ... such person shall ... receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the per *1015 son substantially contributed to the prosecution of the action.
31 U.S.C. § 3730(d)(1).

. Publicly disclosed allegations included those based upon public disclosures "from the news media,” 31 U.S.C. § 3730(e)(4)(A) (1994), and in Rockwell it "was conceded that the claims on which [the relator] prevailed were based upon publicly disclosed allegations within the meaning of § 3730(e)(4)(A).” Rockwell, 549 U.S. at 467, 127 S.Ct. 1397.