# United States Court of Appeals

## For the First Circuit

No. 13-1732

UNITED STATES, EX REL. VEN-A-CARE OF THE FLORIDA KEYS, INC.,

Plaintiff, Appellee,

v.

BAXTER HEALTHCARE CORPORATION,

Defendant, Appellee,

v.

LINNETTE SUN AND GREG HAMILTON,

Appellants.

No. 13-2083

UNITED STATES, EX REL. LINNETTE SUN;
UNITED STATES, EX REL. GREG HAMILTON,

Plaintiffs, Appellants,

v.

BAXTER HEALTHCARE CORPORATION,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Howard, Lipez and Barron,
<u>Circuit Judges</u>.

———————————

    <u>David J. Chizewer</u>, with whom <u>Courtney R. Baron</u>, <u>Goldberg Kohn LTD.</u>, <u>Lauren John Udden</u>, <u>Frederick M. Morgan, Jr.</u>, <u>Jennifer M. Verkamp</u>, <u>Morgan Verkamp, LLC</u>, and <u>Mark Allen Kleinman</u> were on brief, for appellants.
    <u>Steven J. Roman</u>, with whom <u>Merle M. DeLancey, Jr.</u>, <u>Dickstein Shapiro LLP</u>, <u>Peter E. Gelhaar</u>, and <u>Donnelly, Conroy & Gelhaar, LLP</u> were on brief, for Baxter Healthcare Corporation, appellee.
    <u>James J. Breen</u>, with whom <u>The Breen Law Firm</u>, <u>Rand J. Riklin</u>, <u>John E. Clark</u>, and <u>Goode Casseb Jones Riklin Choate & Watson</u> were on brief, for Ven-A-Care of the Florida Keys, Inc., appellee.

———————————

December 1, 2014

———————————

**BARRON, Circuit Judge.** This appeal involves a lawsuit against a pharmaceutical company for allegedly defrauding the federal Medicaid and Medicare programs. The suit is based on the False Claims Act, 31 U.S.C. §§ 3729-3733, an unusual federal statute that allows private parties, called "relators," to stand in for the United States and bring what are known as qui tam actions.[1] Because qui tam actions let private individuals recover damages for wrongs done to the United States, a special threshold bar -- the "first-to-file" rule -- sometimes stands in their way. It is that bar that is in dispute here.

The first-to-file rule is so named because it blocks qui tam suits that are filed while similar enough ones are already pending. In this case, the District Court ruled appellants' qui tam suit could not go forward because a Florida pharmacy years before had brought one a lot like it. We agree with the District Court on that point and thus affirm the dismissal of appellants' suit. Because that decision takes care of this appeal, we do not decide the other issues the parties discuss.

---

[1] "Qui tam is short for the Latin phrase qui tam pro domino rege quam pro se ipso in hac parte sequitur, which means 'who pursues this action on our Lord the King's behalf as well as his own.'" Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 768 n.1 (2000).

**I.**

To understand why we are only now considering the first-to-file rule in a case that began nine years ago, we need to describe the two qui tam actions involved, the alleged fraud each identified, and the complicated procedural path that led the District Court to decide their similarities required the later suit's dismissal. To do all of that, though, we first need to go back nearly two decades, to 1995.

That was when Ven-A-Care of the Florida Keys, Inc., the pharmacy, filed the first of the two qui tam actions involved here. Ven-A-Care alleged a number of pharmaceutical companies had fraudulently inflated the prices of their drugs, thus securing higher reimbursements through Medicare and Medicaid than they deserved. Among the many companies named in Ven-A-Care's complaint was Baxter Healthcare Corporation.

Baxter's status as a defendant was kept from public view for more than a decade because Ven-A-Care filed its qui tam suit under seal. See 31 U.S.C. § 3730(b)(2), (3) (False Claims Act complaints must be filed in camera and may be kept under seal at the government's behest). But in 2010, the United States decided not to intervene in Ven-A-Care's case, and that led to the complaint's unsealing.[2] See id. § 3730(b)(4)(B). The Judicial

_____

[2] By that point, Ven-A-Care had amended its complaint on four occasions. The operative Ven-A-Care complaint for purposes of this appeal is the Fourth Amended Complaint, which was filed on December

-4-

Panel on Multidistrict Litigation then consolidated Ven-A-Care's suit with nearly one hundred similar actions -- most filed under laws other than the False Claims Act -- in the United States District Court for the District of Massachusetts. See In re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d 20 (D. Mass. 2007); In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61 (D. Mass. 2005).

About a year later, in October of 2011, Baxter and Ven-A-Care reached a settlement agreement. Baxter agreed to pay tens of millions of dollars to be shared between Ven-A-Care and the United States. In return, the Settlement Agreement and Release purported to "fully and finally release[], acquit[], and forever discharge[]" Baxter from "any and all civil, regulatory, and/or administrative claim, action, suit, demand, right, cause of action, liability, judgment, damage, or proceeding . . . which has been asserted, could have been asserted, or could be asserted in the future . . . for or arising from any of the Covered Conduct." The agreement defined "Covered Conduct" as Baxter's submission of inflated price and cost figures, and its subsequent receipt of higher-than-deserved reimbursements, for "any and all drugs manufactured, marketed and/or sold by or on [its] behalf."

---

11, 2002 -- more than two years before the other relators in this case brought their suit against Baxter in 2005.

Despite that agreement, the False Claims Act prevented Ven-A-Care from voluntarily dismissing its action against Baxter without the federal government's consent.  See 31 U.S.C. § 3730(b)(1).  But Ven-A-Care soon did get that consent, and the District Court then entered judgment dismissing Ven-A-Care's action against Baxter, thus seemingly ending Baxter's role in the case.  Baxter's involvement in False Claims Act litigation, however, was not over.  Instead, a new front of litigation had opened.

Years before the dismissal of Ven-A-Care's suit, Linnette Sun, one of Baxter's former employees, and Greg Hamilton, an employee of one of its longtime customers,[3] had teamed up to file a qui tam action of their own against Baxter, and that action was still pending when Baxter settled with Ven-A-Care.[4]  Ven-A-Care and Baxter were aware of Sun and Hamilton's suit when they concluded their settlement talks, but they did not directly alert Sun and

---

[3] Sun was a research director for Baxter, and in that capacity was responsible for pricing one of the drugs listed in her and Hamilton's complaint.  Hamilton worked for a pharmacy that purchased Baxter's products and used one of the commercial reporting compendia allegedly crucial to the fraud Baxter carried out.

[4] Partly as a result of the fact that Sun and Hamilton filed their action before Ven-A-Care's was publicly disclosed, this case does not implicate the False Claims Act's "public disclosure" bar, 31 U.S.C. § 3730(e)(4).  See generally United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 20-28 (1st Cir. 2009) (analyzing text, history, and structure relevant to "public disclosure" bar).  The parties do not argue otherwise.

Hamilton to their impending agreement.[5]  Instead, after the United States signed off on Baxter's settlement with Ven-A-Care and that suit had been dismissed, Baxter moved for partial[6] summary judgment in Sun and Hamilton's case.

In doing so, Baxter argued the Ven-A-Care settlement released not only the pharmacy's claims against it, but also Sun and Hamilton's claims as well.  Sun and Hamilton countered they were not parties to the Ven-A-Care action and the United States's consent to the settlement was, as the government put it, "to the dismissal with prejudice only of claims pled in relator Ven-A-Care's complaint against [Baxter]."  Statement of the United States Regarding the Consent of the United States to the Dismissal with Prejudice of Claims Pursuant to 31 U.S.C. § 3730(b)(1) in a Related Matter, In re Pharm. Indus. Average Wholesale Price Litig., No. 1:01-cv-12257-PBS (D. Mass. Nov. 14, 2011), ECF No. 7897 (emphasis added).  Sun and Hamilton thus argued the Ven-A-Care settlement agreement should not be read to release their claims.

---

[5] Ven-A-Care did file the Settlement Agreement and Release on the docket that applied for the entire multidistrict litigation against all the pharmaceutical-company-defendants, but Ven-A-Care did not provide Sun and Hamilton with any further notice of the agreement.

[6] Sun and Hamilton had previously amended their complaint to add retaliation and employment discrimination claims not now before us, but Baxter's summary judgment motion was brought with respect to the False Claims Act claims only.

The District Court disagreed, however, and granted summary judgment.

But Baxter was still not free and clear. Sun and Hamilton argued in a motion for reconsideration that even if the Ven-A-Care settlement did cover their claims, the agreement could not release those claims until Sun and Hamilton got a hearing on whether "the proposed settlement is fair, adequate, and reasonable under all the circumstances." 31 U.S.C. § 3730(c)(2)(B). Their argument depended on their characterization of the settlement as an "alternate remedy" the United States had chosen to pursue for Baxter's fraud. See id. § 3730(c)(5).

The District Court agreed with Sun and Hamilton that the settlement was an "alternate remedy" under the Act, but that presented a procedural puzzle about how Sun and Hamilton could get the fairness hearing. After all, the Ven-A-Care suit had already been dismissed, and thus that case was over. The District Court suggested a possible solution might be available through an arguably novel construction of Federal Rule of Civil Procedure 60(b), which allows parties to move to reopen judgments in certain limited circumstances. In response, Sun and Hamilton filed a motion in Ven-A-Care's case against Baxter -- to which Sun and Hamilton were not parties -- that argued they had a right to a fairness hearing under the False Claims Act that required reopening the Ven-A-Care judgment.

That motion, in turn, led to the first-to-file ruling we now focus on in this appeal. In responding to Sun and Hamilton's Rule 60(b) motion, Baxter for the first time argued that, wholly apart from the settlement agreement with Ven-A-Care, Sun and Hamilton could not proceed with their suit. The reason, Baxter argued, was that Ven-A-Care's qui tam action -- which was pending when Sun and Hamilton filed theirs -- stated all the essential facts of the fraud alleged by Sun and Hamilton. As a result, Baxter contended, the Ven-A-Care complaint had triggered the False Claims Act's first-to-file bar -- and thus, Sun and Hamilton's suit could not go forward.

The District Court agreed, and denied the Rule 60(b) motion solely for that reason, entering identical orders in both Sun and Hamilton's own lawsuit and the Ven-A-Care case in which they sought to intervene. The Court thus left unaddressed the issues about the statutory right to a fairness hearing Sun and Hamilton might enjoy and its potential bearing on reopening the Ven-A-Care case. The District Court then dismissed Sun and Hamilton's suit.

Sun and Hamilton now appeal that judgment of dismissal. They challenge not only the District Court's first-to-file ruling but also its earlier summary judgment decision finding that Ven-A-Care's settlement with Baxter also released Sun and Hamilton's

claims against Baxter.  Baxter and Ven-A-Care defend both rulings as appellees.

## II.

The "first-to-file" rule is, at least in this Circuit, jurisdictional.  United States ex rel. Wilson v. Bristol-Myers Squibb, Inc., 750 F.3d 111, 117 (1st Cir. 2014) ("The FCA first-to-file rule is jurisdictional . . . .").  But cf. United States ex rel. Shea v. Cellco P'ship, 748 F.3d 338, 345-46 (D.C. Cir. 2014) (Srinivasan, J., concurring in part and dissenting in part) (noting that D.C. Circuit has not definitively ruled on first-to-file bar's jurisdictional character).  If we affirm on that ground, therefore, we would not reach whether Baxter's settlement agreement with Ven-A-Care independently released Sun and Hamilton's claims, as the District Court initially held.  Nor would we reach whether the government, by consenting to the Ven-A-Care settlement, secured an "alternate remedy" for Baxter's alleged fraud, such that Sun and Hamilton were entitled to a fairness hearing before that settlement agreement could take effect, as the District Court later determined.  Nor, further, would we reach whether Sun and Hamilton, as non-parties, could move to reopen the Ven-A-Care judgment, as the District Court also ruled.  And so we skip over these various issues -- the District Court acknowledged they presented a "procedural pretzel" -- so we may focus on an

issue that precedes them all: whether the District Court was right to accept Baxter's first-to-file defense.

We begin with the portion of the False Claims Act that gives rise to the first-to-file rule: 31 U.S.C. § 3730(b)(5). It states that, when a private party files a qui tam action under the False Claims Act, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."[7]

Of course, lawsuits, like anything else, may be "related" along many dimensions. And the ways in which a subsequent filing might be "based on the facts" of an earlier one are many as well. But this Circuit has explained that what matters, given this statutory language and the Act's underlying purposes, are two things: (1) the relationship between the fraud alleged in the two qui tam actions, and (2) the extent to which the facts alleged in the first-filed qui tam action suffice to provide the government with notice of the fraud that has been alleged by the second. See Wilson, 750 F.3d at 117-19; United States ex rel. Heineman-Guta v.

---

[7] Because Sun and Hamilton filed this action against Baxter while Ven-A-Care's was still under seal -- and thus was still "pending" -- the first-to-file rule applies to this action even though the earlier-filed action has now been dismissed. See United States ex rel. Heineman-Guta v. Guidant Corp., 718 F.3d 28, 34 n.7 (1st Cir. 2013); cf. United States ex rel. Carter v. Halliburton Co., 710 F.3d 171, 182-84 (4th Cir. 2013) (allowing a related action to be filed after the original action was dismissed), cert. granted sub nom. Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter, 134 S. Ct. 2899 (2014).

-11-

Guidant Corp., 718 F.3d 28, 35-36 (1st Cir. 2013); United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 32-33 (1st Cir. 2009).

This focus makes good sense. By limiting when follow-on qui tam suits may be brought, the Act in section 3730(b)(5) does not guarantee that anyone with useful information about fraudulent conduct against the United States may recover damages by bringing a suit based on such knowledge. Rather, the Act seeks to ensure the federal government receives the information it needs to launch a meaningful investigation into fraudulent conduct. Wilson, 750 F.3d at 117. That "purpose of the qui tam action under § 3730(b) is satisfied" when the government receives a complaint that contains "'genuinely valuable information'" of sufficiently notice-supplying quality. Heineman-Guta, 718 F.3d at 35-36 (quoting United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 234 (3d Cir. 1998)). And treating such a first-filed complaint as precluding a similar enough later-filed one furthers the Act's purposes in another way. Such treatment "provide[s] incentives to relators to promptly alert the government" of any fraud. Wilson, 750 F.3d at 117 (citation and internal quotation marks omitted). There is thus no reason to read section 3730(b)(5) to let later-filing relators sue merely because they offer additional information that might also help the government carry out its investigation.

-12-

Against this background, the first-to-file rule requires that we check to see whether the complaint in the first qui tam suit provided enough detail to ensure that "the government knows the essential facts of a fraudulent scheme" -- for once the government knows that much, "it has enough information to discover related frauds." Id. at 118 (quoting United States ex rel. Branch Consultants v. Allstate Ins. Co., 560 F.3d 371, 378 (5th Cir. 2009)). Or, as we have put the point elsewhere, "to provide sufficient notice to the government of the alleged fraud and bar a later-filed complaint under § 3730(b)(5)[,] earlier-filed complaints must provide only the essential facts to give the government sufficient notice to initiate an investigation into allegedly fraudulent practices" also alleged in the later-filed action. Heineman-Guta, 718 F.3d at 36-37.

In this way, the statement in Heineman-Guta that a first-filed complaint need provide only "sufficient notice to initiate an investigation into allegedly fraudulent practices," id. at 36-37, informs the "essential facts" test, it does not supplant it. Before barring a second complaint, we must ask not merely whether the first-filed complaint provides some evidence from which an astute government official could arguably have been put "on notice," id. at 35, 38, but also whether the first complaint contained "all the essential facts" of the fraud it alleges, id. at 34 (citation omitted).

Under this "essential facts" standard, a later-filed claim cannot go ahead if it "'states all the _essential facts_ of a previously-filed claim' or 'the same _elements_ of a fraud described in an earlier suit.'"  Wilson, 750 F.3d at 117 (quoting Duxbury, 579 F.3d at 32).  It follows that there need not be identity between the two complaints to trigger the first-to-file rule.  "[T]he first-to-file rule 'still bar[s] a later claim even if that claim incorporates somewhat different details.'"  Id. at 118 (alteration in original) (quoting Duxbury, 579 F.3d at 32).

With this legal framework in mind, we compare the Ven-A-Care complaint to the Sun and Hamilton complaint.  See In re Natural Gas Royalties Qui Tam Litig. (CO2 Appeals), 566 F.3d 956, 964 (10th Cir. 2009) ("The first-to-file bar is designed to be quickly and easily determinable, simply requiring a side-by-side comparison of the complaints."); United States ex rel. Poteet v. Medtronic, Inc., 552 F.3d 503, 516 (6th Cir. 2009) ("In order to determine whether a relator's complaint runs afoul of . . . § 3730(b)(5)'s first-to-file bar, a court must compare the relator's complaint with the allegedly first-filed complaint.").  In doing so, we review de novo whether the first complaint meets the "essential facts" test, as that test presents a question of law about the statutorily required threshold for notifying the government of the fraud alleged in the later-filed suit.  Wilson, 750 F.3d at 117.

**A.**

In many qui tam suits involving the first-to-file rule, a central question is whether the two actions concern the same fraud or distinct ones. But Sun and Hamilton lead with a different contention. They claim the Ven-A-Care complaint was so vague and conclusory when it came to Baxter's conduct that it was as if the complaint alleged no fraud at all. Thus, they argue that only they "provided the type of information necessary to give the Government a meaningful head start on its investigation" into Baxter's fraud. They stress they identified "names, meetings, statements, and documents" specific to Baxter's fraudulent scheme, while, they argue, Ven-A-Care set forth none.

But Sun and Hamilton are not fair to the Ven-A-Care complaint. The Ven-A-Care complaint did lack the detail Sun and Hamilton's sets forth, but it was not bereft of facts specific to Baxter's allegedly fraudulent conduct. The Ven-A-Care complaint did at numerous points attribute the fraud to the defendants through the use of plural indefinite pronouns, such as "each" or "all." But that way of identifying the defendants does not make the Ven-A-Care complaint any less useful to the federal government. Baxter was covered by those same words, and the False Claims Act surely should not be read to discourage a relator from alleging a fraud perpetrated by many defendants.

In any event, Ven-A-Care's complaint contained a separate section devoted solely to Baxter. In that section, Ven-A-Care alleged Baxter knowingly made false representations about the price and cost of its drugs in order to receive fraudulently inflated reimbursements from Medicare and Medicaid and "further made or used false records or statements regarding its prices and costs of the drugs . . . and submitted same to [Medicare and Medicaid]." Ven-A-Care also alleged Baxter got reimbursed for a number of drugs -- including the anti-hemophilia drug Recombinate, which Baxter manufactured -- above their true costs and prices. Indeed, even Sun and Hamilton acknowledge Ven-A-Care "disclosed a pricing spread for Recombinate." The contention that Ven-A-Care's complaint entirely lacked Baxter-specific allegations, therefore, is simply wrong.

Sun and Hamilton are on stronger ground in saying their complaint showed greater familiarity with how Baxter pulled off the supposed fraud. By drawing on their inside knowledge as a former employee of Baxter and a former employee of a longstanding customer of Baxter, respectively, Sun and Hamilton did offer far more detail than Ven-A-Care about particular actors within Baxter and the role those actors played. Whether that matters, however, is a different issue.

We have made clear the first-to-file rule does not necessarily protect more detailed, later-filed complaints from less

detailed, earlier-filed ones.  See Wilson, 750 F.3d at 118-19.  So long as the first complaint sets forth the "essential facts" of the fraud alleged in the second complaint, it does all it needs to do under the first-to-file rule.  Id. at 117.  Thus, Sun and Hamilton must show not only that they provided more detail than Ven-A-Care, but also that Ven-A-Care did not provide enough detail -- even if it provided some.

Exactly how specific a complaint must be to provide the "essential facts" is not something we have previously described with precision.  And precision may be too much to ask, given the context-specific nature of the inquiry.  Still, important guidance may be found in our decision in Heineman-Guta.

There, we explained that, for purposes of 31 U.S.C. § 3730(b)(5), a complaint need not contain the kind of detailed and particularized allegations of fraudulent conduct -- such as the names of the particular persons responsible for carrying out certain aspects of an alleged fraud -- required to fulfill the heightened pleading standard for fraud cases set forth in Federal Rule of Civil Procedure 9(b).[8]  See Heineman-Guta, 718 F.3d at 36-

---

[8] Rule 9(b) -- which commands that "a party must state with particularity the circumstances constituting fraud or mistake" -- requires a complaint making such an allegation to "specify the time, place, and content of an alleged false representation." Heineman-Guta, 718 F.3d at 34 (quoting United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 731 (1st Cir. 2007)).  The specificity needed to make out a claim of liability against a particular defendant, however, may be greater than the amount of detail needed to ensure the government has what it needs to launch

37. We also addressed an argument much like the one Sun and Hamilton now press -- that an earlier-filed qui tam complaint was too unspecific to bar a later-filed qui tam suit, even if Rule 9(b) did not establish the minimum amount of detail a qui tam complaint must provide to trigger the False Claims Act's first-to-file bar.

Heineman-Guta involved a relator who brought a qui tam action that claimed her employer and one of its affiliates had engaged in a kickback scheme to promote the sale and use of cardiac devices they manufactured. Id. at 29. Thirteen months before that relator sued, however, another former employee had filed a qui tam complaint against the same company. Id. at 30, 32. The second relator argued the complaint filed by the first, which the parties agreed "disclosed a fraudulent scheme nearly identical to the one alleged in [the second relator's] complaint," id. at 34 n.8, "fail[ed] the essential facts test because it lack[ed] allegations that the scheme actually caused physicians to implant [the employer's] devices or that those devices were covered by Medicare," id. at 38 n.12. We rejected that argument because a complaint "need not contain a detailed play-by-play narration of how the scheme led to the submission of false claims" to trigger the first-to-file rule. Id. Instead, we found "sufficient" for

a meaningful investigation into the alleged fraud. See id. at 35 ("[T]he allegations of a preclusive first-filed complaint under § 3730(b)(5) need not comport with Rule 9(b)'s pleading requirements to provide the government with sufficient notice of potential fraud.").

-18-

purposes of section 3730(b)(5) the first complaint's allegations that the company "caused false statements and claims to be made to the government for reimbursement under Medicare" "through multiple forms of kickbacks designed to induce physicians and hospitals to use [their] devices."  Id.

Ven-A-Care's complaint, too, did not offer a "play-by-play" of events or a detailed narration of how the alleged fraud played out.  But the complaint did identify the key highlights about how Baxter conducted the supposed fraud.  The complaint detailed the particular pricing mechanism Baxter used for carrying out the alleged fraud (leveraging the knowledge that Medicare and Medicaid based their reimbursement payments on cost and price estimates that were reported by various commercially available drug pricing compendia, and thus entering into special "charge-back" arrangements with select wholesalers in order to artificially inflate the estimates that were supplied to the compendia and then reported by them).  The complaint specified the drugs involved (including, among many others, the anti-hemophilic Recombinate).  The complaint described the time period during which the scheme occurred ("the period starting from on or before December 31, 1993 and continuing through" the date on which it was filed, December 11, 2002).  And the complaint set forth what Ven-A-Care contended was corroborating evidence of Baxter's fraud (namely, a chart listing various reported costs and prices).

Ven-A-Care's complaint thus hardly resembles the example Sun and Hamilton cite in their brief of a complaint they contend could not possibly trigger the first-to-file bar: "a one-sentence complaint stating nothing more than: 'Baxter is committing pricing fraud against the Government.'" Nor is the Ven-A-Care complaint the kind of "overly broad and speculative complaint" we have indicated cannot suffice "to notify the government of a fraudulent scheme." Id. at 38. Instead, Ven-A-Care's complaint contained "the essential facts" of Baxter's alleged fraud, and thus gave "the government sufficient notice to initiate an investigation into allegedly fraudulent practices." Id. at 36-37.

This conclusion is consistent with our other first-to-file precedents, even though Sun and Hamilton say otherwise. Sun and Hamilton rely in particular on our decision in Duxbury. There, we held an earlier-filed qui tam complaint about an allegedly fraudulent scheme involving drug pricing did not bar a second relator's later-filed suit alleging the same defendant had engaged in an off-label promotion scheme.[9] 579 F.3d at 32-33. Standing on

---

[9] In Duxbury, the original complaint filed by the first relator contained two counts, one alleging "substantive" False Claims Act violations, and the other alleging conspiracy. 579 F.3d at 17. In support of the "substantive" violations, the complaint alleged (1) that the defendant had published a fraudulently inflated average wholesale price for Procrit, an anemia drug; (2) that it had marketed the "spread" between the inflated price and the true price as a way of inducing healthcare providers to purchase the drug; and (3) that it had undertaken "phony drug studies" in encouraging healthcare providers to prescribe Procrit for non-approved uses. Id.

its own, <u>Duxbury</u> might be read to support Sun and Hamilton's position.  <u>Duxbury</u> did say the later-filed complaint "contained a number of allegations that discuss, <u>in significant detail</u>," the alleged off-label promotion scheme, and <u>Duxbury</u> did allow that second, more detailed complaint to survive the first-to-file bar. <u>Id.</u> at 33 (emphasis added).

But our decision to allow the second suit to go forward in <u>Duxbury</u> did not rest on the greater detail in the later complaint.  Instead, as we later explained in <u>Wilson</u>, the key difference was that the later-filed complaint "alleged a complex off-label promotion and direct marketing scheme," while the original complaint focused on kickbacks and in fact "'<u>nowhere</u>

---

The later-filed complaint -- which, like the first one, was filed by a former sales representative of the defendant company -- also alleged the company had paid kickbacks to healthcare providers in order to induce them to write prescriptions for Procrit that would otherwise not have been written.  <u>Id.</u> at 18.  But the new complaint additionally alleged that the company had engaged in a comprehensive scheme to promote "a dosing regimen of 40,000 units once per week even though it had not received approval from the FDA for such a high dosage," and that the company's widespread "promotion of this off-label use caused the filing of false claims for reimbursement with Medicare and Medicaid, insofar as the providers sought reimbursement for nonreimburseable uses."  <u>Id.</u> (internal quotation marks omitted).

In support of this latter allegation, the second complaint enumerated a number of promotion efforts the defendant allegedly had undertaken, detailing the many ways in which the company carried out the off-label promotion scheme.  <u>See</u> <u>id.</u> at 33.  By contrast, the first complaint referenced only a single drug study "in which [the defendant] allegedly paid physicians to dose Procrit at 40,000[ units] in a once per week dose instead of the FDA approved dosage of 10,000[ units] three times per week dosage in cancer-chemotherapy patients."  <u>Id.</u> at 17.

-21-

refer[red] to an off-label promotion scheme.'" Wilson, 750 F.3d at 119 (alteration in original) (quoting Duxbury, 579 F.3d at 33). Thus, even if the initial complaint in Duxbury provided some evidence relevant to the "complex off-label promotion and direct marketing scheme," it still did not provide the "essential facts" about the complex fraud because that fraud was described and identified only in the later-filed complaint and "nowhere" in the earlier one. Id.

So understood, Duxbury is a very different case from this one. With one possible caveat we address below, Sun and Hamilton and Ven-A-Care do not dispute that their respective complaints each focused on the same fraudulent scheme. And, as we have explained, each described that scheme in significant detail. The only divergence in their complaints, therefore, is the same one we thought too slight in Wilson. As there, the later relators here (Sun and Hamilton) included many details about the underlying scheme the first relator (Ven-A-Care) did not supply. But the use of comparatively greater detail in describing the same underlying fraud is not what matters for the first-to-file rule. Otherwise, the "essential facts" test would be reduced to an "identical facts" test. See Wilson, 750 F.3d at 118-19. And, as we explained in Wilson, such an understanding of the "essential facts" test cannot be right because "once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related

-22-

frauds."[10]  750 F.3d at 118 (quoting Branch Consultants, 560 F.3d at 378).

Simply put, once the government gets sufficiently valuable information from a qui tam complaint about the same fraud alleged by a follow-on complaint, the purposes of the first-to-file rule have been fully served.[11]  And here, both complaints focused on the very same fraud Baxter allegedly committed, and the first of the complaints, Ven-A-Care's, provided enough specific information about the alleged fraud to satisfy the first-to-file rule.

**B.**

Sun and Hamilton do make one final argument.  This one does not focus on the comparatively greater detail they supplied about the fraud in question, or on the supposedly insufficient detail Ven-A-Care offered.  Instead, Sun and Hamilton argue their complaint -- and theirs alone -- sketched out the inner workings of Baxter's fraudulent scheme after the year 2000, and that Baxter's post-2000 conduct resulted in a fraudulent scheme separate from the fraud Ven-A-Care identified.  Thus, at least as to Baxter's post-2000 conduct, Sun and Hamilton portray themselves to be like the

---

[10] All other Circuits to have addressed the issue have thus rejected an "identical facts" test.  See United States ex rel. Chovanec v. Apria Healthcare Grp. Inc., 606 F.3d 361, 363 (7th Cir. 2010) (collecting cases).

[11] At least, this is true so long as the first relator's suit remains pending.  See generally Carter, 710 F.3d at 182-84, cert. granted sub nom. Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter, 134 S. Ct. 2899 (2014).

second relator in Duxbury -- the only one who sufficiently alleged the complex off-label promotion scheme.[12]

This argument would have some force if true. But Sun and Hamilton's complaint suggests Baxter's fraud did not change much after 2000 -- or, at least, not enough to distinguish it from the fraud described in the Ven-A-Care complaint.

According to Sun and Hamilton, in 2000 the New York Medicaid Fraud Control Unit apprised various pharmacy directors of a pattern of misrepresentations by drug manufacturers of the average wholesale prices and acquisition costs of their drugs. As a result, Sun and Hamilton alleged, some of the industry reporting compendia agreed to stop reporting average wholesale price values published by drug manufacturers and to instead report figures on the basis of true market prices.

Sun and Hamilton alleged Baxter got around this new practice by providing the compendia with what Baxter called "list sales prices." Although they went by a different name, these "list sales prices" -- like the manufacturer-provided average wholesale prices the compendia now refused to accept -- also reflected artificially inflated amounts paid by only a few select wholesalers

---

[12] At oral argument, Sun and Hamilton expressly disclaimed that their complaint alleged a new scheme by virtue of the fact that only they made allegations with respect to Baxter's pricing of Advate, a drug Baxter released only after Ven-A-Care filed its operative complaint but that both parties agree is, as the District Court found, very closely related to the other Baxter drug at issue in Sun and Hamilton's complaint, Recombinate.

with whom Baxter had entered into special "charge-back" deals.[13] Sun and Hamilton further claimed that, by supplying as "list sales prices" only what the few "charge-back" wholesalers paid, Baxter provided the compendia values that "bore no relationship to the price charged in the marketplace." And because the compendia ultimately accepted these "list sales prices" and then reported them, Sun and Hamilton alleged Baxter was able to obtain "a substantial spread" between the prices it charged the overwhelming majority of its buyers and the amounts it received in reimbursements from the government.

According to Sun and Hamilton, they alone described this post-2000 fraud. And, to bolster that contention, Sun and Hamilton argue Ven-A-Care's complaint could not possibly have provided the "essential facts" about Baxter's post-2000 fraud because that earlier-filed complaint "contain[ed] no allegations relating to [Baxter's] post-1999 conduct." But the section of Ven-A-Care's complaint specific to Baxter began by alleging that, "[t]hroughout the period starting from on or before December 31, 1993 and continuing through the present date," Baxter "knowingly caused

_____

[13] Although Sun and Hamilton referred to these deals frequently in their complaint, they did not explain the nature of the "charge-back" deals. By contrast, Ven-A-Care did. Its complaint stated the "charge-back" deals involved select wholesalers purchasing drugs from manufacturers at far-above-market prices, knowing the manufacturers would repay them (and pay them a service fee for their troubles) after they sold the products to retailers at market value.

Medicare/Medicaid to pay false or fraudulent claims for prescription drugs and biologicals." Since Ven-A-Care's last-amended complaint was filed on December 11, 2002, Ven-A-Care's allegations covered nearly three years' worth of "post-1999 conduct" specific to Baxter. So, on the timing point, Sun and Hamilton are simply wrong.[14]

Sun and Hamilton also argue Ven-A-Care's complaint, regardless of the time-span it addresses, said too little about what Baxter did to adjust to the compendia's change in practice after 2000. But this argument, too, is not right. Ven-A-Care's complaint stated the named defendants (Baxter included) frequently provided cost and price figures to the reporting compendia in terms of "List Price" instead of true market prices. And the complaint alleged each or all of the named defendants provided the compendia with cost and price figures from the "charge-back" wholesalers, thereby obtaining the problematic gains. These are the very same mechanisms Sun and Hamilton identify in their complaint. In fact, Ven-A-Care's complaint offered more details about the "charge-back" mechanism than did Sun and Hamilton's complaint.

---

[14] The Seventh Circuit has explained that the fact that an earlier-filed complaint covers a time period prior to the period covered in a later-filed complaint does not in and of itself render the two complaints unrelated for first-to-file purposes, see Chovanec, 606 F.3d at 363, but we need not resolve that question since the Ven-A-Care complaint does describe a fraud that extended well past 2000.

Thus, while Sun and Hamilton in most respects provided more detail about exactly what Baxter did after the compendia shifted their reporting practices, any meaningful differences between Baxter's pre-2000 and post-2000 fraud were ones about which Ven-A-Care's complaint provided the "essential facts." This conclusion follows because a review of Ven-A-Care's complaint shows that, whatever it may have left out, it did give the federal government sufficient notice to launch a meaningful investigation of Baxter's alleged misconduct both before and after the reporting practices changed in 2000. See Heineman-Guta, 718 F.3d at 36-37 (explaining that "to provide sufficient notice to the government of the alleged fraud and bar a later-filed complaint under § 3730(b)(5)[,] earlier-filed complaints must provide only the essential facts to give the government sufficient notice to initiate an investigation into allegedly fraudulent practices").

## III.

In asking us to reverse the District Court, Sun and Hamilton make an intuitively appealing contention. The Supreme Court has explained that "[s]eeking the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own" is one central purpose of the False Claims Act's qui tam provisions. Graham Cnty. Soil & Water Conservation Dist. v. United States ex

rel. Wilson, 559 U.S. 280, 294 (2010) (quoting United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 649 (D.C. Cir. 1994)). And here, Sun and Hamilton -- a former high-ranking employee of Baxter and an employee of one of Baxter's longtime customers, respectively -- are "whistle-blowing insiders," not "opportunistic plaintiffs who have no significant information to contribute of their own." Furthermore, Sun and Hamilton warn that, if we apply the first-to-file rule to bar their suit, insiders like them will be discouraged from coming forward with valuable information about potential fraud for fear a less knowledgeable relator already beat them to the door.

But considered more fully, Sun and Hamilton's contention is not so powerful. Although achieving that "golden mean" is certainly one key purpose of the False Claims Act's first-to-file rule, we have previously explained that another is "to provide incentives to relators to promptly alert[] the government to the essential facts of a fraudulent scheme." Wilson, 750 F.3d at 117 (alteration in original) (quoting Duxbury, 579 F.3d at 24). Sun and Hamilton's preferred approach might well frustrate that goal. If adopted, insiders who knew more about a fraud might have less reason to come forward quickly. They would face less risk that diligent relators who did not know as much, but still knew enough to permit the government to launch a meaningful investigation into that same fraud, would beat them to court. It is not clear why the

-28-

provision of the Act that establishes the first-to-file rule should be read to discourage insiders from acting promptly on their knowledge.

But however one might choose to make the tradeoff between speed and quality in the abstract, our precedents make clear how we must make it here. Section 3730(b)(5) of the False Claims Act prevents Sun and Hamilton's suit from going forward. Their complaint merely provides "additional facts and details about the same scheme" pled in Ven-A-Care's earlier-filed complaint, Heineman-Guta, 718 F.3d at 36, which already provided the "essential facts" about that same scheme. The decision dismissing Sun and Hamilton's suit is therefore AFFIRMED.