The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date: January 9, 2025

**NO. S-1-SC-39522**

**MONICA GALLOWAY, SHAWNA MAESTAS, and JOLENE GONZALES,**

Plaintiffs-Petitioners,

v.

**NEW MEXICO OFFICE OF THE SUPERINTENDENT OF INSURANCE,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Francis J. Mathew, District Judge**

Egolf + Ferlic + Martinez + Harwood, LLC
Katherine M. Ferlic
Kristina Martinez
Mark A. Cox
Heather Tanner
Katherine E. Murray
Santa Fe, NM

for Petitioners

Office of Superintendent of Insurance
R. Alfred Walker
Lawrence M. Marcus
Santa Fe, NM

New Mexico Department of Information Technology
Todd S. Baran
Santa Fe, NM

for Respondent

**OPINION**

**THOMSON, Chief Justice.**

**I.     INTRODUCTION**

{1}     The Fraud Against Taxpayers Act (FATA), NMSA 1978, §§ 44-9-1 to -14 (2007, as amended through 2015), imposes civil liability for knowingly presenting a false or fraudulent claim for payment to the State.[1] *See* § 44-9-3(A)(1). FATA is unique in that it provides for a civil action known as *qui tam*, where a private party, known as a relator, can enforce FATA's terms on behalf of the State. *See* § 44-9-5(A). When a relator initiates enforcement and files the initial complaint, the New Mexico Attorney General (AG) must "diligently investigate [the] suspected violations." *See* § 44-9-4(A). The AG must then make a decision: (1) intervene, take over the action, and share fifteen to twenty-five percent of any proceeds with the *qui tam* plaintiff, *see* § 44-9-5(C); § 44-9-7(A)(1), or (2) allow the *qui tam* plaintiff to control the action and keep twenty-five to thirty percent of the recovery, *see* § 44-9-6(F); § 44-9-7(B). Regardless of the State's decision to intervene, the State may also "elect to pursue [its] claim through any *alternate remedy* available, including an

---

[1] Our reference to "State" includes both the New Mexico Attorney General and State agencies such as the New Mexico Office of the Superintendent of Insurance. Where the distinction is important, we reference the entities separately.

administrative proceeding to determine a *civil money penalty*." Section 44-9-6(H) (emphasis added). This opinion clarifies when FATA entitles a relator to a share of proceeds collected by the State through an alternate remedy, in this case an administrative audit.

{2}     A group of relators, Monica Galloway, Shawna Maestas, and Jolene Gonzales (collectively Plaintiffs), contend they have a right to a share of a $15.6 million recovery collected from Presbyterian Health Plan (PHP) and Presbyterian Insurance Company (PIC) by the New Mexico Office of the Superintendent of Insurance (OSI). Unlike FATA's intervention provision, the alternate remedy provision does not stipulate a recovery percentage for relators. *See* § 44-9-6(H). Its terms are more general, acknowledging that when the AG pursues an alternate remedy, the "qui tam plaintiff shall have the *same rights* in [the alternate remedy] proceeding as the qui tam plaintiff would have had if the action had continued" in district court. Section 44-9-6(H) (emphasis added). But FATA offers courts little guidance in distinguishing a relator entitled to an award from one that is not.

{3}     The standard approach for determining a relator's right to an award looks for "overlap" between the relator's complaint and the settlement agreement arising from the alternate proceeding. *United States ex rel. Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 373 (8th Cir. 2015) (requiring that "a relator seeking recovery must

establish that there exists an overlap between Relator's allegations and the conduct discussed in the settlement agreement" (brackets, internal quotation marks, and citation omitted)). If there is sufficient overlap, the relator is entitled to a share of the proceeds. *See id.* at 374. The central issue here is the degree of overlap required to reach sufficiency.

{4} Plaintiffs' complaint[2] alleged that PHP took unlawful deductions and credits that led to the underpayment of premium taxes for fourteen years from 2000 to 2014. Health insurance companies, like PHP, are required to pay a premium tax based on the gross amounts of premium and policy fees received. NMSA 1978, § 7-40-3(A) (2023) ("The premium tax is imposed at a rate of three and three-thousandths percent of the gross premiums and membership and policy fees received or written by a taxpayer."). An insurer may reduce its total tax payment through deductions and credits. *See* NMSA 1978, § 7-40-6 (2023) (describing Medical Insurance Pool credits); NMSA 1978, § 59A-6-5(B) (2018) (discussing overpayment refund). Plaintiffs accused PHP of underpaying its premium taxes by abusing both. After investigating Plaintiffs' claims, the AG's office intervened, joining PIC and Presbyterian Network, Inc. (PNI) with PHP as defendants and adding additional

---

[2]Throughout this opinion our reference to Plaintiffs' *complaint* is to the amended complaint.

claims against PHP. The AG then settled only two years of Plaintiffs' decade-plus allegations and pursued the remaining claims through an OSI administrative proceeding—an audit, the alternate remedy at issue. The audit resulted in a $15.6 million recovery stemming from PHP and PIC's underpayment of its premium taxes by improperly applying Medical Insurance Pool (MIP) credits. Neither the Plaintiffs' complaint nor the State's intervening complaint mentioned MIP credits.

{5}    Plaintiffs moved to recover a percentage share of the proceeds collected from the audit, believing the alternate remedy resulted from their original *qui tam* complaint. The district court denied Plaintiffs' recovery, finding there was insufficient overlap between Plaintiffs' FATA lawsuit and the administrative recovery because Plaintiffs' complaint failed to specifically name MIP credits. The district court's holding relied on *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493 (6th Cir. 2007), and the heightened pleading standard set forth in New Mexico's Rule 1-009(B) NMRA for averments of fraud.[3] Rule 1-009(B) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). The Court of Appeals affirmed. *See*

_____

[3]Similar to the facts of this case, *Bledsoe* was appealed twice to the Sixth Circuit. Some courts refer to the cases as *Bledsoe I* and *Bledsoe II*. Because we are focused on *Bledsoe II*, our reference to "*Bledsoe*" is to the heightened pleading standard applied in *Bledsoe II*.

*Galloway v. N.M. Office of Superintendent of Ins.*, A-1-CA-38974, mem. op. ¶¶ 22, 27 (N.M. Ct. App. July 14, 2022) (nonprecedential).

{6}    We disagree that such an exacting pleading standard is appropriate for an overlap analysis. The degree of overlap required by the district court is one of perfect identity. That sort of mirror-image standard is contrary to New Mexico's pleading standards, frustrates the purpose and principles of FATA, and lacks textual support. For these reasons, and others described in this opinion, we forgo entirely the use of a pleading standard to determine a relator's right to an award and instead adopt the material elements test from FATA's first-to-file rule. *See* § 44-9-5(E). In order to prevent parasitic claims of fraud by opportunistic parties, the False Claims Act, 31 USC §§ 3729-3733 (2024) (FCA), and FATA contain first-to-file provisions that bar subsequent related actions "alleging the same material elements of fraud described in [the] earlier suit, regardless of whether the allegations incorporate somewhat different details." *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001), *overruled on other grounds*, *Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244, 1246-47 (9th Cir. 2024). We apply the material elements test in the alternate remedy context to determine if a State's subsequent action or settlement is sufficiently related to a *qui tam* plaintiff's earlier FATA claim to warrant a share of the proceeds for the *qui tam* plaintiff.

5

{7}     While it is important to establish "what" the appropriate standard is for an overlap analysis and "how" to apply it, clarity is needed as to "when" a court applies the material elements test. We hold that the material elements test is not a default requirement whenever the State pursues an alternate remedy. It is not required when the government litigates the claim through intervention. As we discuss, when the alternate remedy is merely a continuation of the State's intervention, the relator's rights under the alternate remedy provision have already been determined by the intervention statute. *See* § 44-9-7(A) (providing that where the State intervenes and proceeds with an action brought by a relator, the relator shall receive ten to twenty-five percent of the proceeds depending on the nature of the information provided and the relator's level of contribution).

{8}     Although the district court makes the final determination, the record demonstrates that the State's alternate remedy and subsequent recovery from PHP is merely a continuation of Plaintiffs' original FATA action. The district court will need to conduct an overlap analysis using the material elements test to determine whether relators are entitled to a share of the recovery. Therefore, we vacate the Court of Appeals memorandum opinion and remand to the district court for findings

consistent with this opinion.[4]

**A.    Background**

{9}    *Qui tam* actions date back to our nation's earliest days at the First Congress. *See* "[E]*numeration*" Act of Mar. 1, 1790, 1st Cong. Sess. II, ch. 2, § 3, 1 Stat. 101, 102 (enforcing marshals' misfeasance in census-taking); "[R]*egulation of Seamen*" Act of July 20, 1790, 1st Cong. Sess. II, ch. 29, § 1, 1 Stat. 131, 131 (allowing for *qui tam* actions against ship commanders who fail to contract with the seamen). They have played an enforcement role in contexts ranging from the prevention of slave trafficking with foreign nations to the seizing of illegally imported liquor. *See* "*Slave Trade*" Act of Mar. 22, 1794, 3rd Cong. Sess. I, ch. 11, §§ 2, 4, Stat. 347, 349 & n.(a) (illustrating an early informer statute that provided a bounty to public, nongovernmental informers for the value of the seized ship); "*Distilled Spirits*" Act of Mar. 3, 1791, 1st Cong. Sess. III, ch. 15, § 44, 1 Stat. 199, 209. *Qui tam* actions take their modern form in statutes like the FCA. Originally enacted during the Civil War, the Northern armies found themselves shorthanded of supplies because of "gross abuses" and "stupendous frauds" by defense contractors. H.R. Rep. No. 2,

---

[4]To the extent the district court finds overlap for claims against either PIC or PHP, the relators' share was set at twenty percent of total recovery in the settlement agreement.

37th Cong., 2d Sess., 71, 99 (1861). President Lincoln called upon Congress to pass the FCA to stem the bilking of the federal fisc. *See* 132 Cong. Rec. 22339 (1986) (statement of Rep. Howard Berman). The FCA turned the general public into "a posse of ad hoc deputies to uncover and prosecute frauds against the government" in exchange for a share of the recovered proceeds. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009) (emphasis, internal quotation marks, and citation omitted).

{10} Well over a hundred years after FCA enactment, the New Mexico Legislature adopted a similar statute. FATA, in part, prohibits a person from making "a false, misleading or fraudulent record to conceal, avoid or decrease an obligation to pay . . . the state or a political subdivision." Section 44-9-3(A)(4). Like its federal counterpart, FATA vests private parties with standing to bring actions on behalf of the State in exchange for a portion of the proceeds. *See generally* § 44-9-5.

**1.    Plaintiffs' complaint**

{11} Plaintiffs, as employees of the OSI, believed that PHP had underpaid premium taxes through unlawful deductions and improper credits. After exhausting

administrative remedies,[5] Plaintiffs filed a FATA lawsuit against PHP alleging a comprehensive scheme of filing fraudulent tax returns based, in part, on general and specific allegations of unlawfully claimed deductions and improper credits to reduce PHP's premium tax liability. The complaint accused PHP of at least $55 million in unlawful deductions and at least $40 million in improper credits totaling more than $95 million owed to the State. As mandated by FATA, Plaintiffs also demanded treble damages, making Plaintiffs' claim potentially worth $285 million. *See* § 44-9-3(C)(1). Pertinent to this case, only three types of credits reduce premium tax liability: MIP credits, Health Alliance credits, and overpayment credits. None of Plaintiffs' allegations referenced any of the credits by type, including MIP credits.

**2.      Attorney General investigation and strategy memo**

{12}      Once Plaintiffs filed their FATA suit, the AG had sixty days to investigate and notify the court of its intent to intervene or allow Plaintiffs to proceed with the action. *See* § 44-9-5(D). The AG extended the sixty-day period and investigated Plaintiffs' claims for almost a year. Two key events transpired during the investigation.

{13}      First, the AG disclosed a copy of the lawsuit to OSI while the case was still

---

[5]Plaintiffs reported the fraud to the OSI, the FBI, the New Mexico Attorney General, and the Legislative Finance Committee, all of whom decided not to take action.

under seal. The Office of the State Auditor and OSI then hired an independent auditor, Examination Resources (ER), to "[r]ecalculate premium tax liability, payments received, and resulting net over or underpayments . . . for each year from 2003 to 2016." OSI opened two administrative collection dockets, one for PHP and one for PIC. During the course of the audit, Plaintiffs gave direct assistance to ER, providing documents, analysis, and deep reviews of PHP's tax history. This audit— and the subsequent recovery—comprise the alternate remedy that is the focus of this appeal.

{14}    Second, during the investigation, and prior to intervening, the AG's office circulated a strategy memo that discussed different FATA provisions the AG could employ to limit Plaintiffs' recovery. The memo noted that "we can either wait to [limit recovery when] the case generates proceeds, or we can approach the relators prior to intervention and attempt to bind them to a particular share." The option of not intervening and pursuing an alternate remedy was also discussed, noting that "[the AG's] alternate proceeding would *closely mirror* the *qui tam* action, [so] it will be difficult for us to articulate to the Court our reasons for initiating separate litigation" (emphasis added).

**3.    Intervention and amended complaint**

{15}    Three months after distributing the strategy memo, the AG intervened.

10

Notably, the AG did not move to narrow or dismiss Plaintiffs' FATA claim or in any way argue that the Plaintiffs' complaint lacked specificity in its pleading. *See*, *e.g.*, § 44-9-6(B) (allowing the State to seek dismissal for good cause). Rather, the AG's complaint reasserted Plaintiffs' FATA claim, joined two additional defendants: Presbyterian Insurance Company, Inc. (PIC) and Presbyterian Network, Inc. (PNI),[6] and alleged five additional statutory and common-law claims against PHP. Repeating many of Plaintiffs' allegations, the AG detailed a "15+ year fraudulent enterprise to avoid responsibility for tens of millions of dollars to which New Mexico taxpayers are entitled" and demanded inter alia treble damages as allowed by FATA. The AG's complaint did not specifically reference MIP credits or allege fraud related to MIP credits.

**4.     Settlement**

{16}     A few months after the State intervened, the AG's office began settlement negotiations with Plaintiffs and PHP. The settlement was two-fold. First, the AG settled the FATA lawsuit with PHP. While Plaintiffs' action alleged improper deductions and credits spanning over a decade from 2000 to 2014, the AG limited the settlement to two years, 2003 and 2004, of unlawful "Medicaid Premium Tax

---

[6]PNI owns the common stock of PHP and PIC.

11

and Premium Tax Credits" claimed by PHP. PHP agreed to pay over fifteen million dollars, of which Plaintiffs received a relator share of twenty percent. The agreement released PHP of liability for all additional claims arising out of the FATA suit except for "the findings contained in or related [to] the [ER] Report," which OSI remained free to pursue in the administrative proceedings against PHP and PIC. Second, the AG entered into a separate agreement with Plaintiffs that provided as follows:

> The pursuit of recoveries by OSI related to the ER Report or related findings by the Office of the State Auditor, which is hereby delegated by the AG to OSI, is *deemed an alternate remedy* as defined in 44-9-6(H), and encompass[es] the Relators' right to a share of the proceeds under 44-9-7(A).

(Emphasis added.)

{17}   A few months after executing the settlement agreements, the audit concluded, and OSI issued findings that PHP and PIC had "misapplied" MIP credits from 2003 through 2016, resulting in a net underpayment of premium taxes by PHP of approximately $14.4 million and by PIC of $1.2 million. OSI also concluded that PHP underpaid $14.4 million in taxes based on erroneously applied overpayment credits and erroneous political subdivisions but found that the FATA settlement satisfied this amount. OSI collected $15.6 million from PHP and PIC for the misapplied MIP credits and placed twenty percent in a suspense fund, presumably

12

in anticipation of Plaintiffs' demand to obtain a share of the OSI recovery.[7]

**5.      Plaintiffs' attempted recovery of alternate remedy proceeds**

{18}      Plaintiffs brought a declaratory judgment action against OSI seeking a twenty percent *qui tam* share of the $15.6 million recovered from the alternate remedy proceeding. The district court denied Plaintiffs' motion, relying on *Bledsoe*'s requirement that "[p]leading an actual false claim with particularity is an indispensable element of a complaint that alleges a[n] FCA violation." *Bledsoe*, 501 F.3d at 504. Because "Plaintiffs' FATA Lawsuit made no claim related to MIP credits and did not name either PNI or PIC as a defendant," the district court found the complaint lacked the required specificity to allow recovery of proceeds from the alternate remedy.

{19}      Plaintiffs appealed, and the Court of Appeals initially remanded to the district court for additional findings and conclusions to address, in part, whether there was overlap "between Plaintiffs' qui tam lawsuit and the administrative proceedings [and] to what extent that overlap informed the district court's relevant conclusions

---

[7]Notably, the call for the audit does not appear to specifically reference MIP credits or any of the premium tax credits by name.

13

of law."[8] Reasserting Rule 1-009(B)'s heightened pleading standard, the district court found that "[t]here was no overlap between the FATA Lawsuit and [the OSI proceedings because] Plaintiffs failed to bring a claim for MIP credits against PHP, PIC and PNI."

{20}    With the aid of the additional findings, a divided Court of Appeals panel affirmed the district court's denial of Plaintiffs' claim for a share of the OSI recovery. The Court viewed the "narrow question" as whether the OSI recovery "qualifies as proceeds of a claim brought by Plaintiffs in their qui tam action." *Galloway*, A-1-CA-38974, mem. op. ¶ 17. The majority held that sufficient evidence supported the district court's finding of no overlap, in part because neither "'Medical Insurance Pool' nor the acronym 'MIP' appears in Plaintiffs' amended qui tam complaint." *Id.* ¶ 22. The Court did not directly cite *Bledsoe*. However, by affirming the district court based primarily on the absence of a claim related to MIP credits, the Court of Appeals imported the district court's reliance on *Bledsoe* into its analysis.

{21}    The dissent disagreed with the majority on three distinct grounds. First, the

---

[8]The Court of Appeals also remanded two additional issues regarding the evidentiary basis of the district court's decision and the interplay between the amounts recovered by the OSI and FATA proceedings. However, neither issue is before this Court, so they remain unaddressed in this opinion.

dissent took issue with the majority's implicit acceptance of *Bledsoe*. *See Galloway*, A-1-CA-38974, mem. op ¶ 29 (Henderson, J., concurring in part and dissenting in part). The dissent noted that *Bledsoe*'s exacting pleading rule is unusual even among federal circuit courts. *Id.* ¶ 32 (citing cases) (Henderson, J., concurring in part and dissenting in part). Second, the dissent observed the discontinuity in using a pleading standard that tests the sufficiency of a complaint at the initiation of an action to determine an award at its conclusion and "warned of the perverse incentive for the government [to use *Bledsoe*] to strip qui tam plaintiffs of earned proceeds." *Id.* (citing *Roberts v. Accenture, LLP*, 707 F.3d 1011, 1017-18 (8th Cir. 2013)). Finally, the dissent argued that adopting *Bledsoe*'s strict standard runs afoul of the spirit of FATA "and the incentive for individuals to bring fraud to light." *Id.* The dissent would have remanded for further findings and conclusions under a less demanding standard. *See id.* ¶¶ 29, 31, 33.

## II.     DISCUSSION

{22}     At first glance, this appeal presents a single question: what pleading standard is appropriate for an overlap analysis when the State pursues an alternate remedy? We agree with Plaintiffs that *Bledsoe*'s strict Federal Rule of Civil Procedure 9(b) (hereinafter Rule 9(b)) standard applied by the district court and implicitly adopted by the Court of Appeals is contrary to New Mexico's pleading provisions and the

purpose of FATA. However, two important questions remain unresolved. First, is a pleading standard the correct test to determine whether a relator should receive a share of the recovery? And second, must courts always apply an overlap test whenever there is an alternate remedy? We answer "no" to both questions. As to the first question, we decide instead to adopt the principles of the material elements test to determine a relator's right to an award. As to the second question, we determine that overlap analysis does not apply where claims under an alternate remedy proceeding are found to be continuous from the relator's FATA complaint.

{23}    Our conclusion keeps one eye on the text of FATA and the other on its intent and purpose. As we have stated before, FATA attempts to achieve the golden mean between limiting "'parasitic' qui tam plaintiffs while also providing an incentive for meritorious qui tam plaintiffs to pursue their claims." *State ex rel. Foy v. Austin Cap. Mgmt., Ltd.*, 2015-NMSC-025, ¶ 17, 355 P.3d 1; *Roberts*, 707 F.3d at 1018 ("A primary purpose of the FCA is to encourage whistleblowers to come forward with allegations of fraud perpetrated upon the government."). Like the FCA, FATA "encourage[s] legitimate relators to file *quickly* by protecting the spoils of the first to bring a claim" through provisions like the statutory first-to-file rules. *In re Nat. Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 961 (10th Cir. 2009) (emphasis added); Section 44-9-5(E) ("[N]o person other than the attorney general . . . may intervene

16

or bring a related action based on the [first-to-file FATA action].""). By "spur[ring] the prompt reporting of fraud," the FCA (and FATA) place "a premium on the timeliest complaints over the most detailed." Brian D. Howe, *Conflicting Requirements of Notice: The Incorporation of Rule 9(b) into the [FCA]'s First-to-File Bar*, 113 Mich. L. Rev. 559, 582 (2015) (internal quotation marks omitted) (quoting *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 377 (5th Cir. 2009)). The judicial tools employed to determine a relator's entitlement to recovery must conform with FATA's objectives.

{24}    *Bledsoe*, relied on by the district court to deny Plaintiffs' award, both undermines FATA's objective to promote timely claims and encourages, rather than limits, parasitic claims. Parasitic claims may arise not only from opportunistic third-party relators but also from the State. FATA's framework implies a cooperative relationship where relators assist the government in rooting out fraud in exchange for a reward. However, this mutually beneficial partnership belies the often adversarial posture between the State and *qui tam* plaintiffs. Adopting *Bledsoe*'s mirror-image standard, where a relator's complaint must specifically mention each fraud, would allow the State to intervene and then, by pursuing an alternate remedy, could easily dissociate the relator from any award based on subtle nonidentical facts. *Rille*, 803 F.3d at 373-74 ("[P]roceeds of 'the claim must extend to proceeds of a

17

settlement in which the conduct contemplated in the settlement agreement . . . overlap[s] with the conduct alleged in [the] Relator's complaint.' Otherwise, the government could deprive the relator of his right to recover simply by recasting the same or similar factual allegations in a new claim or by pursuing the substance of the relator's claim in an alternate proceeding." (second and third alterations and omission in original) (citation omitted)). *Bledsoe*'s mirror-image pleading standard would create disparate outcomes depending on the State's position or alternate remedy to the relator's claim. The path chosen by the State should not dictate or limit a *qui tam* plaintiff's ability to recover a share of an award. A relator should be afforded the same access to potential recovery—that is to say, the relator should have the *same rights* to recovery—regardless of whether the State intervenes, the State pursues an alternate remedy, or the relator retains control of the action (albeit the percentage shares may differ). Allowing otherwise would frustrate worthy *qui tam* plaintiffs from pursuing claims. Our adoption of the material elements test attempts to balance these concerns.

{25}    We are, therefore, compelled to reject *Bledsoe*'s hypertechnical application of Rule 9(b). In the next section, we discuss why an exacting pleading standard is inappropriate to appraise the *sufficiency* of a complaint or to perform an *overlap* analysis. While this case does not directly implicate the adequacy of Plaintiffs'

complaint, we address both issues—sufficiency and overlap—because of how the district court applied *Bledsoe*'s pleading standard to determine the award. We also conclude, more generally, that a pleading standard used to assess the sufficiency of the complaint at the start of an action is inconsistent with an overlap analysis that determines a relator's reward at the conclusion of the action. The material elements test addresses these deficiencies, balancing the informational disparity between complaint and settlement while ensuring that only deserving relators share in the recovery. Finally, we hold that claims considered under alternate remedy proceedings are not de facto subject to an overlap analysis. Rather, only those claims that arise under the alternate remedy provision are subject to further scrutiny.

**A.    *Bledsoe* Is Not an Appropriate Test for the Sufficiency of a Complaint or for Overlap**

{26}    Because we are called upon to interpret FATA and our rules of civil procedure for pleading fraud, our review is de novo. *Chatterjee v. King*, 2012-NMSC-019, ¶ 11, 280 P.3d 283 ("Statutory interpretation is an issue of law, which we review de novo." (internal quotation marks and citation omitted)); *Becenti v. Becenti*, 2004-NMCA-091, ¶ 6, 136 N.M. 124, 94 P.3d 867 ("[W]hen called upon to apply and interpret rules of civil procedure, we review these questions de novo."). "We find the cases construing FATA's federal analogue, the [FCA], helpful in understanding the context and purpose of FATA." *Foy*, 2015-NMSC-025, ¶ 16.

19

**1.** ***Bledsoe* tests the sufficiency of a complaint, not overlap**

{27}    We first note that we do not read *Bledsoe* as articulating or applying a test for *overlap* but as a post hoc examination of the sufficiency of a relator's pleadings. In *Bledsoe*, the Sixth Circuit examined whether a relator was due a share of proceeds from an alternate remedy proceeding after the government declined to intervene in the FCA claim. *Bledsoe*, 501 F.3d at 497. The *Bledsoe* Court, however, never reached the overlap inquiry. Rather, the court scrutinized the relator's amended complaint "paragraph-by-paragraph" to determine whether each allegation of fraudulent conduct was pled with sufficient particularity. *Id.* at 509, 512-15. Except for a single allegation of fraud relating to a particular patient, *id.* at 514-15, the court held that the relator had not sufficiently pled a valid *qui tam* claim, *id.* at 522. Because the relevant claims were not viable, "there [was] no prospect for relators to recover on their claims," and so overlap was not possible. *Id.* at 522.

{28}    Here, the district court merged *Bledsoe*'s pleading standard with an overlap analysis. The district court quoted *Bledsoe*'s holding "that pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a[n] FCA violation in compliance with Rule 9(b)." *Bledsoe*, 501 F.3d at 504. The district court then found, "There was no overlap between the FATA Lawsuit and [the audit findings because] Plaintiffs failed to bring a claim for MIP credits against PHP, PIC,

20

and PNI."

{29}     We admit that the district court's ultimate conclusion is unclear. One reading is that the court found the complaint facially insufficient; that is, in the district court's view in reliance on *Bledsoe*, because there was no valid *qui tam* claim, there was no entitlement to a reward. On the other hand, the district court may have concluded that Plaintiffs' complaint was not sufficient to allege a claim of fraud related to MIP credits, thus barring recovery. However, under either application—sufficiency or overlap—*Bledsoe*'s heightened scrutiny reveals several immediate flaws.

**2.     *Bledsoe*'s heightened pleading standard**

{30}     As a sufficiency benchmark, *Bledsoe*'s standard is unsupported by the history of Rule 9(b), conflicts with other federal jurisdictions interpreting FCA claims, is wholly inconsistent with New Mexico pleading norms under Rule 1-009(B), and ignores stark differences between common law fraud claims and FATA.

{31}     The history underlying Rule 9(b) is scant, and what is available does not support *Bledsoe*'s strict approach. The Advisory Committee Notes to the original 1937 rules indicate only that Rule 9(b) was drawn from the English Rules under the Judicature Act. *See* Rule 9(b) advisory comm. notes (1937 adoption). In the United States, the nineteenth-century Field Codes, precursor to the Rules of Civil Procedure, did not mandate a particularity requirement for pleading fraud. Christopher M.

21

Fairman, *An Invitation to the Rulemakers—Strike Rule 9(b)*, 38 U.C. Davis L. Rev. 281, 284 (2004). Historians assume the rule is an artifact of the merger of the courts of law and equity, but justification for the rule's adoption is unclear. *See* Ni Qian, *Necessary Evils: How to Stop Worrying and Love Qui Tam*, 2013 Colum. Bus. L. Rev. 594, 614 (2013). Even the Honorable Charles E. Clark, one of the chief architects of the Federal Rules, said that Rule 9(b) "probably states only what courts would do anyhow and may not be considered absolutely essential." Hon. Charles E. Clark, *Simplified Pleading*, 2 F.R.D. 456, 463-64 (1943).

{32} Given the absence of history and commentary, the justifications for Rule 9(b)'s particularity standard are judicially contrived. Chief among those is the twofold explanation that a heightened pleading standard "afford[s a] defendant *fair notice* of the plaintiff's claim and . . . safeguards [the] defendant's *reputation* and goodwill from improvident charges of wrongdoing." *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990) (emphasis added). Of course, it remains unclear how standard notice pleading requirements fail to put defendants on notice when the subject matter is fraud. Neither is it clear the basis upon which fraud against the government warrants a special badge of reputational ignominy when compared to other actions in intentional tort or professional malpractice where standard pleading requirements are acceptable. *See, e.g.*, *Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 8, 335

P.3d 1243 (discussing a medical malpractice claim under a Rule 1-008 NMRA notice pleading standard); *Hefferman v. Bass*, 467 F.3d 596, 600 (7th Cir. 2006) (analyzing a legal malpractice claim under the federal notice pleading standard, Federal Rule of Civil Procedure 8 (hereinafter Rule 8)).

{33}    Against this backdrop, we note that the rigid pleading standard set forth in *Bledsoe* has been rejected in numerous federal jurisdictions interpreting Rule 9(b) in FCA claims. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014) (noting that several jurisdictions have held that a "rigid pleading standard . . . is unsupported by Rule 9(b) and undermines the FCA's effectiveness as a tool to combat fraud against the United States" (internal quotation marks and citation omitted)); *Galloway*, A-1-CA-38974, mem. op. ¶ 32 (Henderson, J., concurring in part and dissenting in part) (noting that *Bledsoe* is unusual among federal courts applying Rule 9(b) and cataloging cases in support). We agree with those courts that read Rule 9(b) in conjunction with Rule 8(a), which requires "a short and plain statement of the claim." *See Grubbs*, 565 F.3d at 185-86 ("Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading."); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (rejecting *Bledsoe*'s strict approach to pleading in FCA claims).

{34}    *Bledsoe*'s reading of Rule 9(b) is also inconsistent with our interpretation of

23

New Mexico's Rule 1-009(B). Throughout the past eighty-five years, "this Court has maintained our state's notice pleading requirements, emphasizing our policy of avoiding insistence on hypertechnical form and exacting language." *Zamora*, 2014-NMSC-035, ¶ 10; *Kysar v. BP Am. Prod. Co.*, 2012-NMCA-036, ¶ 28, 273 P.3d 867 ("[O]ur rules merely require pleadings to contain a short and plain statement of the claim or defense, and each pleading averment to be 'simple, concise and direct,' even when pleading with particularity." (citation omitted)). Our notice pleading standard extends to matters that must be pled with particularity under Rule 1-009(B). *Robertson v. Carmel Builders Real Est.*, 2004-NMCA-056, ¶ 34, 135 N.M. 641, 92 P.3d 653 ("The evidentiary details of a claim of fraud need not be alleged."). Rule 1-009(B) should not be read to abrogate the efficiency and simplicity of notice pleading. Rather, the "rule is context specific and flexible and must remain so to achieve the remedial purpose" of FATA. *Grubbs*, 565 F.3d at 190 (discussing Rule 9(b) in the context of the FCA).

{35} Finally, the stark differences between the statutory requirements of common law fraud and FATA countenance New Mexico's flexible approach to pleading requirements. An action brought under common law fraud requires:

> [(1)] that a representation was made as a statement of fact which was untrue and known to be untrue by the party making it, or else recklessly made; [(2)] that it was made with *intent to deceive* and for the purpose of inducing the other party to act upon it; and [(3)] that the other party

24

did in fact *rely* on it and [(4)] was induced thereby to act to his *injury* or damage.

*Sauter v. St. Michael's Coll.*, 1962-NMSC-107, ¶ 9, 70 N.M. 380, 374 P.2d 134 (emphasis added). Placing *Fraud* in the title of FATA (*Fraud* Against Taxpayers Act) does not immediately put FATA on par with its common law namesake that formed the backdrop of Rule 9(b)'s heightened pleading standard. Unlike a common law fraud claim, a claim under FATA does not *require* a showing of specific intent, reliance, or injury. FATA's basic requirement for a violation is that a party "knowingly present . . . a false or fraudulent claim." *See* § 44-9-3(A)(1). FATA expressly does not require that a defendant have a specific intent to defraud. Section 44-9-3(B) ("Proof of specific intent to defraud is not required for a violation of Subsection A of this section."). Further, because a breach of FATA's terms occurs at the presentment of the claim, there is no requirement of reliance or a showing that the State suffered an injury. Merely showing that the violation occurred suffices to recover a monetary penalty. Section 44-9-3(C)(2) (establishing a "civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars

($10,000) for *each violation* [of FATA]" (emphasis added)).[9] To the extent that pleading a FATA claim is an action based in "fraud," it is clearly distinct from our traditional understanding of common law fraud. *Grubbs*, 565 F.3d at 189 ("[A] claim under the False Claims Act and a claim under common law or securities fraud are not on the same plane.").

**3.    *Bledsoe* is not an appropriate overlap test**

{36}    We also decline to adopt *Bledsoe*'s pleading standard to determine a relator's eligibility for an award. As a tool for conducting an overlap analysis, *Bledsoe*'s standard contradicts the plain language of FATA and undermines FATA's goal of encouraging whistleblowers by allowing the State to unfairly limit recovery.

{37}    In support of the district court's finding of no overlap, the Court of Appeals advanced a statutory construction argument that when the State "'proceeds with an action *brought by a qui tam plaintiff*,'" the relator's share of the recovery is limited to the action "*as 'brought by'* the qui tam plaintiff." *Galloway*, A-1-CA-38974,

---

[9]Even when FATA makes it a violation to "conspire to defraud the [S]tate," the violation occurs once a person "obtain[s] approval . . . on a false or fraudulent claim," without the requirement that the State paid the claim. Section 44-9-3(A)(3). Similarly, it is also a breach of FATA's terms to "make" a record for the purpose of obtaining approval or supporting a fraudulent claim. Section 44-9-3(A)(2) (making it a violation to "knowingly *make* . . . a false, misleading or fraudulent record . . . to obtain or support the approval of . . . a false or fraudulent claim" (emphasis added)).

26

mem. op. ¶ 17 (first emphasis in original) (quoting § 44-9-7(A)). The Court of Appeals emphatically concluded that recovery "cannot encompass more" than what is in the complaint. *Id.* But nothing in the statute suggests that a complaint must be so narrowly construed.

{38}     On the contrary, the Legislature noted that when the State *proceeds* with the action, the relator *shall* receive a portion of the recovery. Section 44-9-7(A). The State proceeds with the action only after "diligently investigat[ing]" the relator's allegations. Section 44-9-4(A). If the State adds related claims or expands upon the initial complaint, FATA provides for that recovery. There is no language expressing the intent of the Legislature to restrict the relator's proceeds to a preinvestigatory or pre-alternate-remedy state.[10] The retroactive application of *Bledsoe* ignores the

---

[10]The Court of Appeals quotes the Eighth Circuit's discussion in *Rille* that recovery under the FCA is limited to "'the proceeds of the settlement of the claim brought by the [qui tam plaintiffs], and only that claim.'" *Galloway*, A-1-CA-38974, mem. op. ¶ 24 (quoting *Rille*, 803 F.3d at 374). The *Rille* Court placed great weight on the FCA's use of "settlement *of the claim*," reasoning that reference to the *claim* expressed legislative intent to limit a relator's share of a settlement to the claim as initially brought in the complaint. *Rille*, 803 F.3d at 372 (emphasis added); *see also* 31 U.S. § 3730(d)(1) (2024). Whatever persuasive merit this argument may carry is irrelevant here. When drafting FATA, the Legislature did not include language that limited the settlement to a claim, providing relators with an award for the entirety "of the proceeds of the action or settlement." Section 44-9-7(A)(1). We find these distinctions indicative of a legislative intent to prefer recovery and thereby encourage relators to bring claims to the government's attention.

realities of investigation and discovery inherent in trial or administrative proceedings where additional and related violations are uncovered. It also overlooks the informational asymmetry faced by many relators, where evidence is withheld or unobtainable until the State investigates or a court applies the powers of discovery. *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1258 (D.C. Cir. 2004) (recognizing that plaintiffs may be unable to meet the particularity standard of Rule 9(b) because of lack of access to documents under the defendant's control).[11]

{39} Further, if the State forgoes intervention, the relator "shall have the right to conduct the action." Section 44-9-6(F). The relator's right to proceed means they may develop the action, including amending their complaint as necessary to conform with the evidence. *See* Rule 1-015(B) NMRA. *Bledsoe* frustrates a relator's right to participate in the natural development of a proceeding when an alternate remedy is pursued because the analysis is strictly confined to the complaint. Importantly, it also means that a relator who continues independently seemingly has greater rights to recovery than when an overlap analysis is applied, frustrating FATA's declaration

---

[11]Withholding of evidence is precisely what happened to Plaintiffs. PHP refused to submit the requested documentation as part of the relators' initial audit on behalf of OSI.

28

that a relator should have the same rights in an alternate remedy proceeding as they would if the action continued in district court. Section 44-9-6(H).

{40} Accepting *Bledsoe* would also encourage gamesmanship by the State. By simultaneously limiting recovery to the complaint "*as 'brought by'* the qui tam plaintiff" and then, at the conclusion of an alternate remedy proceeding, requiring an exacting description of the fraud (in this case MIP credits), deserving plaintiffs may be easily stripped of their reward. *Galloway*, A-1-CA-38974, mem. op. ¶ 17 (emphasis added) (quoting § 44-9-7(A)). As already discussed, New Mexico pleading standards are more flexible than the hypertechnical approach in *Bledsoe*. Thus, a FATA complaint sufficiently pled under Rule 1-009(B) at the beginning of a proceeding may ultimately be insufficient to survive an overlap analysis at its conclusion. The State, operating with the benefit of investigation and discovery, need only premise settlement on a claim technically distinct from the plaintiff's

complaint to preclude recovery. To allow such gamesmanship is to encourage it.[12]

{41}    Requiring perfect overlap also hinders the prompt reporting of fraud. We read provisions like a first-to-file rule that bars subsequent related actions as incentivizing (and preferring) the timely filing of complaints. *Branch Consultants*, 560 F.3d at 377 (noting that the first-to-file rule is meant to "spur the prompt reporting of fraud" (internal quotation marks and citation omitted)). A relator concerned that a technical detail will preclude recovery may delay or avoid reporting the fraud at all, further hampering FATA's objectives.

{42}    Thus, we find no reason to apply *Bledsoe*'s standard to determine overlap. Applying an overlap standard at the conclusion of a proceeding that demands a greater level of specificity in pleading than that required to survive a sufficiency challenge is antithetical to encouraging whistleblower claims. This Court declines to support an approach that would allow the government to simply push a matter into

---

[12]We also note that applying a pleading standard at the conclusion of the case denies the relator the opportunity to cure any pleading deficiency. *Roberts*, 707 F.3d at 1018 ("If the government is allowed to contend at the conclusion of a case that a relator's initial allegations were insufficient, even though the government implicitly acknowledged the legal sufficiency of the pleadings by choosing to intervene, the relator no longer has the opportunity to cure the deficiency. We find nothing in the FCA's statutory text to support this type of *post hoc* use of Rule 9(b) to deny a relator the right to a share of the settlement proceeds in an action in which the government intervenes.").

an alternate proceeding and preclude a relator's fair share based on a post hoc hypertechnical review.

**B.    The Standard for Assessing Overlap**

{43}    Our concerns with *Bledsoe* identify important criteria for an overlap analysis. An overlap analysis must ensure that the State's chosen path of pursuing an alternate remedy does not inherently limit the possibility of recovery for a deserving relator. The appropriate test for overlap must accomplish this goal, all while limiting unworthy *qui tam* plaintiffs from taking part in an award. The standard for determining a relator's award must encourage the prompt reporting of claims while acknowledging the time and informational constraints inhered in filing a *qui tam* action. The test for overlap must capture the natural progression of an action, where parties gain additional information after the initiation of a suit. And importantly, it must also be fair.

{44}    We think any heightened pleading standard, even one consistent with New Mexico's flexible approach, will frustrate these goals. First, the policy objectives of a pleading standard are mismatched with those of an overlap analysis. Fundamentally, Rule 1-009(B) concerns an adversarial relationship where one party is alleging that the other has committed fraud. Rule 1-009(B) functions as a reputational safeguard that gives notice of the specific fraudulent activity so the party

31

can prepare a responsive pleading. In contrast, the relationship between the State and relator, at least ideally, is one that is mutually beneficial to both parties, where the relator informs the State of fraudulent behavior and then recovers a share of the returns. Thus, reputational justifications for Rule 1-009(B) are inapplicable in an overlap analysis; the State is not suffering reputational harm, nor is it accused of fraudulent behavior. Quite the opposite, the State is the defrauded party.

{45} These disparate objectives counsel different scopes of inquiry. A pleading standard, by its nature, concentrates on the adequacy of the complaint, and only the complaint, at the initiation of an action. It does not connect the dots between the complaint and the ultimate settlement because the action has just initiated. This is a crucial flaw in an overlap analysis where the central question is whether the relator's FATA action and the alternate remedy are sufficiently related to warrant a relator's recovery. The answer may often reside in the complaint, but it may also come through required disclosures, the State's investigation, or later-acquired evidence. Section 44-9-5(C) (requiring that the *qui tam* plaintiff provide a written disclosure of material evidence and information). An overlap analysis should be broad enough to consider this information but narrow enough to prevent windfalls for unworthy relators.

{46} We, therefore, adopt the material elements test from the first-to-file rule and

32

adapt it to assessing a relator's eligibility for a share of recovery. 31 USC § 3730(b)(5) (2024) ("[N]o person other than the Government may intervene or bring a related [FCA] action based on the facts underlying the pending action."); *see* § 44-9-5(E) (describing New Mexico's version of the first-to-file rule). The first-to-file rule prevents parasitic claims by barring subsequent *related actions* when the first complaint "provides the government sufficient information to pursue an investigation into the allegedly fraudulent practices." *Roberts*, 707 F.3d at 1018 (internal quotation marks and citation omitted). The material elements test balances the informational asymmetry between filing a complaint and settlement and ensures the prompt reporting of claims while also preventing successive opportunistic actions.[13] Of course, our application does not bar recovery by the State as would occur to a third-party under the first-to-file rule. As adapted to an overlap analysis, a relator is entitled to a share of the proceeds if their FATA action put the government on notice of the related frauds uncovered during the alternate remedy proceeding. *United States ex rel. Ven-A-Care of the Fla. Keys, Inc. v. Baxter Healthcare Corp.*, 772 F.3d 932, 937-38 (1st Cir. 2014) ("[T]he first-to-file rule requires that we check to see whether the complaint in the first qui tam suit provided

---

[13]New Mexico has not adopted a formal test for FATA's first-to-file rule, so we rely on federal decisions for guidance.

33

enough detail to ensure that the government knows the essential facts of a fraudulent scheme—for once the government knows that much, it has enough information to discover related frauds." (internal quotation marks and citation omitted)).

{47} This section will first articulate the material elements test as applied to an overlap analysis. We then proceed to describe those situations requiring an overlap analysis. If an alternate remedy is merely a continuation of an intervention, we have no reason to create an additional extra-textual obstacle to a relator's recovery. While we remand to the district court for further consideration, we believe the record in this case shows that, in the matter of PHP, the alternate remedy was merely an extension of the intervention. Finally, in the event the district court finds that the alternate remedy was not part of the intervention proceedings, we conclude by highlighting factual elements important in the overlap analysis.

**1. First-to-file rule applied to overlap**

{48} When a *qui tam* complaint is filed under the FCA or FATA, no person other than the attorney general "may intervene or bring a *related action based on the facts underlying the pending action*." *See* 31 U.S.C. § 3730(b)(5) (2024); § 44-9-5(E) (emphasis added). The first-to-file rule "'functions both to eliminate parasitic plaintiffs who piggyback off the claims of a prior relator, and to encourage legitimate relators to file quickly by protecting the spoils of the first to bring a claim.'" *Foy*,

34

2015-NMSC-025, ¶ 17 (citation omitted). The "first-to-file" provision intentionally creates a race to the courthouse. When a later *qui tam* plaintiff files a similar claim, a court must decide whether the subsequent filing is *related* to the initial claim and therefore barred by the earlier suit, or if the new action pleads a sufficiently different fraud such that it may proceed on its own.

{49}   Early on, federal courts were asked to interpret the first-to-file provision narrowly, barring only those later-filed claims where the alleged facts are *identical* to the first-filed *qui tam* complaint. *United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.*, 149 F.3d 227, 232 (3d Cir. 1998). This would have allowed multiple relators to take a share of the proceeds whenever the subsequent relator pled slightly different details. This technical approach mimics the application of *Bledsoe* in an overlap inquiry. Courts uniformly dismissed this approach as antithetical to the legislative intent of the FCA because the risk of piggyback claims would diminish the incentive for relators to promptly bring actions. *LaCorte*, 149 F.3d at 234 ("Under . . . [an] overly narrow interpretation, dozens of relators could expect to share a recovery for the same conduct, decreasing their incentive to bring a *qui tam* action in the first place."); *see also Lujan*, 243 F.3d at 1189 (rejecting an identical facts test); *accord United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 218 (D.C. Cir. 2003); *United States*

35

*ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 32 (1st Cir. 2009); *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1280 (10th Cir. 2004).

{50}     Instead, when determining whether actions were related under the first-to-file provision, these federal circuits have adopted standards that are variations on a central theme. Known as the *essential facts* or *material elements* test, the general rule is that a subsequent action is related, and therefore, barred from a share of the proceeds, if it "alleg[es] the same material elements of fraud described in an earlier suit, regardless of whether the allegations incorporate somewhat different details." *Lujan*, 243 F.3d at 1189. As the Tenth Circuit framed the inquiry, "so long as a subsequent complaint raises the same or a related claim based in significant measure on the core fact or *general conduct* relied upon in the first qui tam action, the first-to-file bar applies." *Grynberg*, 390 F.3d at 1279 (citation omitted). The Third Circuit put it succinctly, stating that "once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *LaCorte*, 149 F.3d at 234. The First Circuit applies a two-part test that looks at "(1) the relationship between the fraud alleged in the two qui tam actions and (2) the extent to which the facts alleged in the first-filed qui tam action suffice to provide the government with notice of the fraud that has been alleged by the second." *Ven-A-Care*, 772 F.3d at 937. We find these various phrasings appropriate for a factual

overlap review and adopt the material elements test for this purpose. When a relator's complaint pleads sufficient facts to put the government on notice of the related fraud in the alternate remedy proceeding, the relator deserves a share of the award.

{51}    As a test for determining recovery, the material elements test most closely adheres to FATA's goal of achieving a "golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *Id.* at 944 (internal quotation marks and citation omitted). The test's flexibility also promotes the prompt reporting of fraud by not requiring a perfect overlap between the two complaints. A *qui tam* plaintiff may recover so long as the relator's action put the State on notice of the fraud underlying the alternate remedy, regardless of whether the government's claim "incorporate[s] somewhat different details." *United States ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 302 (4th Cir. 2017) (internal quotation marks and citation omitted). Differences—such as those of "geographic location or added facts—will not save a subsequent case." *Id.* (internal quotation marks and citation omitted).

{52}    For example, in *Manor Care*, the Fourth Circuit broadly applied the material elements test and barred a subsequent claim despite alleging additional modalities

of fraud across different geographic locations. *Id.* at 304. There, the initial relator filed a *qui tam* suit against a Manor Care nursing facility in Virginia, alleging the facility overbilled Medicare for physical therapy and rehabilitation costs. The initial relator claimed that the facility "regularly and fraudulently classified its patients as needing more physical therapy than necessary and instructed its physical therapists to spend more time than needed with the patients, resulting in higher Medicare payments." *Id.* at 300. A subsequent relator filed an FCA action alleging a separate Manor Care nursing facility in Pennsylvania overbilled by invoicing the government for services never provided, categorizing nonskilled therapy as skilled, and billing for unnecessary therapy. *Id.* at 300-01. The subsequent complaint also alleged that the nursing facility defrauded the government by "consistently administering modalities like electric stimulation, diathermy, and ultra sound to inappropriate patients" and incentivized these actions through bonuses provided to facility directors. *Id.* at 304 (internal quotation marks and citation omitted). The subsequent relator argued the different locations and "'modalities'" of fraud were sufficiently distinct to allow recovery. *Id.* The Fourth Circuit disagreed, noting that the two complaints were "materially similar" and the "earlier-filed complaint provide[d] the government with enough knowledge of essential facts of the scheme to discover related fraud." *Id.* (internal quotation marks and citation omitted).

38

{53} The *Manor Care* approach underscores the pitfalls of applying a pleading standard like *Bledsoe*'s in an overlap analysis. If the Fourth Circuit in *Manor* Care had instead applied *Bledsoe*'s hypertechnical approach, the additional factual details would have allowed the subsequent plaintiff's suit to proceed. *Branch Consultants*, 560 F.3d at 378 ("Any construction of [the first-to-file provision] that focused on the details of the later-filed action would allow an infinite number of copycat *qui tam* actions to proceed so long as the relator in each case alleged one additional instance of the previously exposed fraud."). In the context of an overlap analysis, the government, by incorporating technically distinct details, could deprive the relator of any share of the recovery despite the relator having equipped the government with sufficient information to investigate and discover the related frauds. *See United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011). Such a result would frustrate rather than further the recovery of fraud against the State.

{54} In the present case, OSI counters that a broad overlap standard will injure the State's fisc. Under oath, the AG similarly acknowledged the duty to maximize recovery for the State. But whatever duty the AG and OSI perceive as limiting a deserving relator's award is not echoed by FATA. FATA does not cap the dollar amount that a *qui tam* plaintiff may recover from a successful claim. Instead, FATA uniformly describes a *qui tam* plaintiff's share as a percentage of "the proceeds of

the action or settlement." Sections 44-9-7(A), (B). FATA further provides that "[a]ny award to a qui tam plaintiff shall be paid out of the proceeds of the action or settlement, if any," and that "[t]he state . . . is entitled to all proceeds collected in an action or settlement not awarded to a qui tam plaintiff." Section 44-9-7(D), (E). Perhaps most significantly, FATA provides for treble damages to ensure that the government will be made whole and "to reward the qui tam plaintiff for exposing fraud and corruption in state government." *Foy*, 2015-NMSC-025, ¶ 40. The State's decision to forgo treble damages—alleged at $285 million—and pursue an alternate remedy where treble damages are unavailable was the State's, not the relators. And in a case like this one, brought by current and former employees of a "state or political [entity]," FATA requires a showing that the *qui tam* plaintiff exhausted internal reporting procedures and that "the state or political subdivision failed to act on the information provided within a reasonable period of time." Section 44-9-9(A). Here, prior to filing their complaint, Plaintiffs reported the suspected fraud directly to OSI and the New Mexico AG's office, both of whom did not pursue the investigation. These provisions guarantee that a *qui tam* plaintiff's recovery will be paid from a source of funds that the State already declined to pursue. They also guarantee that both the *qui tam* plaintiff and the State will be rewarded by the *qui tam* plaintiff's initiation of a successful FATA action.

{55} Finally, the material elements test should not be viewed as supporting a catalyst theory of recovery where a relator is entitled to an award for unrelated claims exposed during the course of the alternate remedy proceeding. The material elements test does not support additional claims that merely "'resulted from'" the investigation of the relator's allegations or whose discovery was "'caused by'" the relator's claim. *Rille*, 803 F.3d at 374 (citation omitted). The subsequent claim pursued by the State must be more than causally connected to the original FATA action. The alternate remedy proceeding and the relator's allegations must *relate* substantively to each other. Allowing for catalyst recovery would not further FATA's purpose of encouraging meritorious *qui tam* plaintiffs to come forward with their claims.

**2.      When to apply an overlap test**

{56} The material elements test provides courts with a framework to determine if a relator deserves a share of the alternate recovery. But it does not answer the question of *when* a court should apply the test. The first question a court should ask when confronted with a relator's demand for a share of the proceeds is whether an overlap analysis is necessary. An overlap analysis is required when an alternate remedy is merely a continuation of the FATA action, or if the State separately pursued an alternate remedy. A court's initial inquiry must determine whether the government's

41

*claim* is part of an intervention and, thus, an extension of the relator's claim or if the claim is a wholly separate proceeding arising under the alternate remedy provision. An overlap analysis requires a claim-by-claim comparison of the plaintiff's FATA action, including the relator's complaint and the government's intervening claim (if applicable), and the contents of the settlement agreement or the findings of the subsequent administrative proceeding, whichever applies. This inquiry is not meant to be a substitute for an overlap analysis or function as a pseudo-overlap inquiry; it is meant only to determine whether the rights entitled to the plaintiff under the alternate remedy provision were already established by the State's intervention.

{57}    When the State pursues its *claim* through an alternate remedy proceeding, the *qui tam* plaintiff has the *same rights* as if the action continued in the district court. *See* § 44-9-6(H) (FATA's "alternate remedy" provision). The State's *claim*, as that term is employed in the alternate remedy provision, encompasses two general possibilities. First, the State's claim may be an extension of the relator's FATA action, such as when the State intervenes and subsequently pursues an alternate remedy as a continuation of the *qui tam* plaintiff's original action. When an alternate remedy is merely a continuation of the FATA action in which the State intervened, no overlap analysis is required. In these cases, the rights afforded to the relator have already been determined by the intervention provision. *See id.*; § 44-9-7(A). In

contrast, the government's claim may be wholly separate from the plaintiff's FATA claim. In such cases, when the State's claim arises under the alternate remedy provision, courts should apply an overlap analysis. *Rille*, 803 F.3d at 378 (Bye, J., dissenting) ("Typically, a factual overlap analysis is required in cases arising under [the FCA's] alternate remedy provisions, *not intervention cases*." (emphasis added)).

{58}    This bifurcated framework is consistent with FATA's recovery limitations. Our Legislature has provided only three mechanisms for reducing a relator's recovery once the State intervenes, none of which apply here. *See* § 44-9-7(A)(2) (limiting a relator's share to ten percent "if the court finds that the action was based primarily on disclosures of specific information, not provided by the qui tam plaintiff, relating to allegations or transactions [in other hearings, proceedings, or other publicly available sources]"); § 44-9-7(C)(1) (reducing a relator's recovery when the relator "planned or initiated the violation [of FATA] upon which the action was based"); § 44-9-7(C)(2) (precluding recovery of a share of the proceeds when the relator "is convicted of criminal conduct arising from that person's role in the violation [of FATA]"). Applying an overlap analysis to an intervention case introduces a fourth limitation on a relator's recovery that is not supported by statute.

{59}    If, on the other hand, the State separately pursued an alternate remedy, a court would apply a factual overlap analysis because the State's claim would arise under

43

the alternate remedy statute. The present case implicates aspects of *both* scenarios; the government intervened, settled a portion of the claims, and dismissed the action, but the "remaining claims" were resolved through an alternate remedy.[14] *Galloway*, A-1-CA-38974, mem. op. ¶¶ 16, 17. While more complicated, the central question remains the same: Is the alternate remedy merely a continuation of the relator's FATA action?

{60}     While we remand to the district court to make this determination, we see nothing in our review that suggests the alternate remedy pursued against PHP is anything other than an administrative pursuit of Plaintiffs' FATA claim. We consider it a necessary precondition to conducting an overlap analysis that the claim be outside of the relator's action.[15] Here, after a year of investigating Plaintiffs' allegations, the government intervened. Tellingly, the AG did not move to limit or dismiss Plaintiffs' claim on any of the grounds available under FATA or Rule 1-

---

[14]Some federal courts have discussed alternate remedy proceedings as "an alternative to intervening in a *qui tam* action." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 648 (6th Cir. 2003). However, as the facts of this case illustrate, the State does not have to make an either/or decision and can pursue both paths during the course of a recovery.

[15]We acknowledge that some claims may be continuations of a *qui tam* plaintiff's original action and others may not. Overlap analysis would only be applied to those that were not a part of the original action, not the remaining intervening claims.

009(B). *See, e.g.*, § 44-9-6(B). The AG joined two additional defendants, PNI and PIC, and alleged five additional claims against PHP. Each of the supplemental claims was against PHP, the original defendant, and based on allegations from the Plaintiffs' FATA complaint. Complaint in Intervention, *Galloway v. Presbyterian Health Plan, Inc.*, D-101-CV-2016-01596, ¶ 104 (1st Jud. Dist. Ct. July 11, 2017) (alleging an insurance code violation for underpaying Medicaid premium taxes); *id.* ¶ 109 (asserting PHP was unjustly enriched by claiming unlawful deductions against premium tax returns); *id* ¶¶ 114-18 (alleging that the acts under the FATA violation were also sufficient for a common law fraud claim); *id.* ¶ 121 (claiming that PHP made negligent representations of material facts related to the unlawful deductions and credits); *id.* ¶ 128 (averring that PHP's failure to pay its tax obligations constituted constructive fraud). The AG then settled only two of the fourteen years of Plaintiffs' claims against PHP, dismissing the entirety of the FATA action with prejudice and delegating the "remaining claims" to OSI. The settlement agreement between Plaintiffs and the AG tacitly connects the two proceedings, stating that "[t]he pursuit of recoveries by OSI related to the ER Report . . . is deemed an

alternate remedy."[16]

{61} Also notable is the striking resemblance between the FATA claim and the call of the audit. After the AG's office showed the Plaintiffs' complaint to OSI, the Office of the State Auditor and OSI hired an independent auditor to "[r]ecalculate premium tax liability, payments received, and resulting net over or underpayments . . . for each year from 2003 to 2016" (alteration in original).[17] By comparison, Plaintiffs' FATA claim alleged that PHP's "application of unlawfully-obtained premium tax credits allowed it to avoid payment of more than [$40 million] in premium taxes." The government's claim in the alternate remedy proceeding as it pertains to PHP is a continuation of Plaintiffs' action.[18]

**3. Application of the overlap analysis**

{62} We provide the district court with the following guideposts when applying the material elements test to determine Plaintiffs' entitlement to an award under an

---

[16]To avoid excluding deserving relators from recovery, where there is an intervention and alternate remedy, we think a "fair, adequate and reasonable" settlement agreement should stipulate the relationship between relators' FATA action and the alternate remedy. Section 44-9-6(C).

[17]We note that the record does not indicate that the contract for the ER audit specifically mentioned MIP credits.

[18]Because there were no claims brought against PIC, we cannot say that the alternate remedy was an extension of Plaintiffs' intervention. Therefore, an overlap analysis is appropriate.

overlap analysis. Plaintiffs have a right to a share of the proceeds if the State's MIP claim is "based upon the same material elements of fraud as the [relator's] suit, even though the subsequent [alternate remedy proceeding] may incorporate somewhat different details." *Manor Care*, 851 F.3d at 302 (internal quotation marks and citation omitted). As we have established, the district court should examine "the relationship between the fraud alleged" in the Plaintiffs' FATA action and the State's alternate remedy settlement as well as "the extent to which the facts alleged [by Plaintiffs] . . . suffice[d] to provide the government with notice of the [MIP] fraud." *Ven-A-Care*, 772 F.3d at 937.

{63}    From an evidentiary standpoint, the trial court may examine any pertinent evidence including the complaints, administrative conclusions, depositions, evidence collected during the State's investigation, and settlement agreement. In the usual case, a court will likely not have the expansive record it does here, nor does the court require it. The typical analysis will involve comparing complaints and settlement agreements "side-by-side, and asking whether the [settlement of the alternate remedy proceeding encompasses] a fraudulent scheme the government already would be equipped to investigate based on the first complaint." *Manor Care*, 851 F.3d at 303. The material elements test is designed to be "quickly and easily determinable" so even when there is additional evidence beyond the pleadings, the

matter is likely to be decided on the complaints. *In re Nat. Gas*, 566 F.3d at 964. But to whatever degree there is extrinsic evidence that assists a court in its determination, the court should heed its utility.

{64}     With this legal and evidentiary framework in mind, we observe that the record suggests a finding that Plaintiffs' allegations put the State on notice of PHP's improper application of MIP credits.[19] Plaintiffs' complaint specifically mentions that PHP took unlawful *credits* against their premium tax liability. According to the record, there are only three such credits: MIP credits, Health Alliance credits, and overpayment credits. The parties disagree over whether Plaintiffs' complaint truly encompassed MIP credits and not solely overpayment credits. Plaintiffs cite the complaint's explicit mention of credits and the year-by-year dollar amounts of fraud, exhibits (a workbook explaining the credits), and discussions that they contend alerted the State to MIP credits specifically. The State disagrees with Plaintiffs' presentation of the evidence, and we acknowledge that the record is unclear as to the

---

[19]We do not have a complete record of the exhibits to make additional insights into the outcome of an overlap analysis for PIC. As a sister company of parent PNI, both of which were added to the State's complaint in intervention, it seems natural to investigate related organizations operating in New Mexico that might be committing the same types of fraud. That said, the State's complaint did not contain allegations against PIC, so the district court will need to determine if the Plaintiffs' complaint or any subsequent evidence put the State on notice of PIC's unlawful reporting of credits.

extent MIP credits were discussed. However, the material elements test does not require a smoking gun that MIP credits were explicitly presented, but only that Plaintiffs provided sufficient information for the State, "once [it] knows the essential facts of a fraudulent scheme, . . . to discover the related fraud." *LaCorte*, 149 F.3d at 234. On this point, we find it difficult to believe that the investigation of one unlawful credit would not naturally encompass the investigation of the other, especially, as here, when the relators uncovered the fraud *during* an MIP audit that ultimately went unheeded by OSI officials and the AG's office.

{65} The disagreements in the record between Plaintiffs and the State are of degree and not in kind. The overt parallels between *Manor Care* and the facts of this case are illustrative. In *Manor Care*, the first relator alleged that the nursing facility overbilled for "'skilled physical therapy and rehabilitation costs,'" providing examples of the manner in which the fraud occurred. 851 F.3d at 300. Here, Plaintiffs alleged the unlawful application of credits against PHP's premium tax liability, breaking down the dollar amount of fraud by year. The second relator in *Manor Care* maintained that by adding different "'modalities'" of the fraud, such as overbilling for various procedures "'like electric stimulation'" that were not in the first relator's complaint, the subsequent complaint alleged a separate scheme. *Id.* at 304. Similarly, the State here argues that Plaintiffs are not entitled to an award because the

49

settlement agreement included a specific type of unlawful credit, MIP credits, that was not specifically named in the complaint.

{66} *Manor Care*'s holding appears to be on point on the facts here. The State's settlement agreement is based on allegations that are "materially similar" to those of Plaintiffs—the reduction of premium tax payments through the improper application of credits. *Id.* at 304. The "conduct contemplated in" the results of the OSI audit—findings of PHP's improper application of MIP credits—appears to overlap significantly with the "conduct alleged in [Plaintiffs'] complaint," the application of unlawful credits. *Rille*, 803 F.3d at 373-74 (internal quotation marks and citation omitted). Plaintiffs' allegations also appear to "provide the government with enough knowledge of essential facts of [PHP's underpayment] scheme to discover [the] related [MIP credit] fraud." *Manor Care*, 851 F.3d at 304 (internal quotation marks and citation omitted).

{67} We remind courts that FATA's goal of reducing parasitic claims includes those subsequent claims by the State. The AG's strategy memorandum to reduce Plaintiffs' recovery is a reminder that while FATA implies a mutually beneficial relationship between relator and State, this is not always the reality. This shift from the *shared interest* of fraud reduction to adversaries is unfortunate but hardly unique to New Mexico. *United States v. United States ex rel. Thornton*, 207 F.3d 769, 773

50

(5th Cir. 2000) ("It comes as no surprise that while the government and relator have litigated on the same side, their interests diverge when it comes time to pay the relator's share."); *United States v. Gen. Elec.*, 808 F. Supp. 580, 584 (S.D. Ohio 1992) (order) ("The reason [for the adversarial posture of the Justice Department] continues to be unknown, but the attitude is clear."). Regardless, such an adversarial posture is not supported by FATA, and we remind courts to be vigilant in their review of FATA proceedings.

## III. CONCLUSION

{**68**} For the foregoing reasons, we vacate the Court of Appeals decision and remand to the district court for findings consistent with this opinion. We advise the district court to first determine whether either or both of the PHP and PIC alternate remedy proceedings are continuations of Plaintiffs' FATA action. If the court finds that a proceeding was brought separately under the alternate remedy statute, the court should perform an overlap analysis between Plaintiffs' lawsuit and the specific collection docket using the material elements test.

{**69**} **IT IS SO ORDERED.**

_____
**DAVID K. THOMSON, Chief Justice**

51

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Justice**

_____
**C. SHANNON BACON, Justice**

_____
**BRIANA H. ZAMORA, Justice**

_____
**LISA CHAVEZ ORTEGA, Judge**
**Sitting by designation**